UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| POLYCON INDUSTRIES, INC., | ) | |
| | ) | |
| **Plaintiff & Counter-Defendant,** | ) | |
| | ) | |
| **vs.** | ) | **2:19CV485-PPS/JPK** |
| | ) | |
| R&B PLASTICS MACHINERY, LLC, and | ) | |
| MONROE MOLD, LLC, | ) | |
| | ) | |
| **Defendants & Counterclaimants.** | ) | |

### OPINION AND ORDER

Polycon Industries, Inc. is a manufacturer of "blow molded" plastic bottles and containers. [DE 39 at ¶6.] R&B Plastics Machinery, LLC designs, manufactures and installs machinery that can be used to make blow molded containers. [*Id*. at ¶11.] Monroe Mold designs, manufactures and installs the molds required to make blow molded containers. [*Id*. at ¶12.] This lawsuit arises from Polycon's purchase of two new blow molding machines from R&B which Polycon says have, at best, underperformed and at worst are duds. [*Id*. at ¶10.]

Polycon's First Amended Complaint contains claims against R&B for breach of contract, breach of express warranties, first party indemnity, and fraud in the inducement, as well as claims against Monroe for breach of contract, breach of an implied warranty of merchantability, and breach of an implied warranty of fitness for a particular purpose.[1] R&B has filed a breach of contract counterclaim against Polycon,

---

[1] I previously granted R&B summary judgment on the claim for fraud in the inducement. [DE 107.]

based on Polycon's failure to pay the remaining $471,000.00 on the purchase agreement. [DE 41 at 48.] Presently before me is R&B motion for summary judgment on its counterclaim. Additionally, R&B seeks to reduce its exposure by knocking out Polycon's request for incidental or consequential damages. [DE 129.] Because the contract at issue is ambiguous, and questions of fact abound, the motions will be denied.

## Summary Judgment Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

## Undisputed Facts

For more than 50 years, Polycon has been in the business of manufacturing blow-molded plastic bottles. [DE 137 at ¶1.] In 2015, Polycon decided to increase its manufacturing capacity and turned to R&B, which for decades has designed and built the kinds of machines Polycon needed. [*Id.* at ¶3.] Over the next 10 months, the parties

2

negotiated a contract under which R&B would design and build two blow-molding

machines for Polycon, referred to as the "8/16 machine" and the "4/11 machine."  [*Id*.

at ¶4.]

Based on these negotiations, on March 4, 2016, R&B sent Polycon proposal

number PM 16-4066, in which R&B agreed to supply Polycon with the 8/16 machine in

exchange for a total purchase price of $2,985,000.00.  [*Id*. at ¶5.]  Similarly, on April 11,

2016, R&B sent Polycon proposal number PM 16-3978B, in which R&B agreed to supply

Polycon with the 4/11 machine for a total purchase price of $1,725,000.00.  [*Id*. at ¶6.]

The deal was firmed up a few days later when the parties executed a Terms and

Conditions of Sale agreement, which both parties had the opportunity to review, revise,

and separately sign.  [*Id*. at ¶7.]  After execution of the Terms and Conditions, Polycon

sent R&B two purchase orders:  purchase order E-50386 for the 8/16 machine, and

purchase order E-50387 for the 4/11 machine.  [*Id*. at ¶8.]

The Terms and Conditions include a limitation of liability provision applicable to

both parties under various legal theories, limiting recoverable damages as follows:

> Except as specifically provided for in this Agreement, in no event shall
> either party be liable for any special, consequential, incidental, or indirect
> damages with respect to this Agreement or anything done in connection
> herewith, whether based upon contract, tort (including negligence),
> breach of warranty, strict liability, or otherwise.

[*Id*. at ¶10, quoting DE 59-1 at ¶11.]  This ¶11 of the Terms and Conditions applies to

breach of warranty claims.  [DE 137 at ¶12.]  R&B disclaimed warranties of

merchantability or fitness for a particular purpose.  [*Id*. at ¶13, citing DE 59-1 at ¶3(c).]

3

Paragraph 3(f) of the Terms and Conditions provides:  "Seller will (i) at Seller's option and at Seller's sole cost and expense, repair or replace the Equipment or part that does not conform to the warranty or description herein contained, or refund the purchase price of such Equipment or part, and (ii) at Seller's sole cost and expense, provide qualified technical consultation by phone, written correspondence or with field service as reasonably necessary to resolve any warranty issue."  [DE 137 at ¶14, quoting DE 59-1 at ¶3(f).]

The parties agreed that in the event of a default, "[t]he defaulting party agrees to pay on demand the non-defaulting party's expenses, including reasonable attorneys' fees, expenses and administrative hearing and court costs incurred either directly or indirectly in enforcing any obligation of the defaulting party under this Agreement." [DE 137 at ¶15, quoting DE 59-1 at ¶13(a).]  A "General" provision under the heading "Indemnification" in the Terms and Conditions provides:  "Seller shall indemnify and hold harmless Purchaser, Purchaser's insurers, Purchaser's affiliates and their respective employees, agents, officers and directors for and from all suits, claims, judgments, awards, losses, damages, costs or expenses (including attorneys' fees) relating to, arising out of, or caused by the Equipment, Seller's performance of any Work hereunder or any act or omission of Seller."  [DE 137 at ¶16, quoting DE 59-1 at ¶9(a).]

After the parties executed the April 2016 contract, R&B relied on Polycon's purchase orders and began building the 8/16 and 4/11 machines.  [DE 137 at ¶17.]  In

4

November 2016, R&B began performing machine "runoff" trials (tests) on the 8/16 machine, and on December 21, 2016, R&B performed a final "runoff" test of the 8/16 machine at R&B's facility. [*Id.* at ¶18.] Polycon's plant engineer, Matt Muta, attended the runoff, and signed an "Equipment Release for Shipment" form. [DE 137-3 at 2.] [2]

With respect to the 4/11 machine, Polycon waived a runoff at R&B's facility. [DE 137 at ¶20.] After the December 2016 runoff, both machines were disassembled at R&B's facility, shipped to Polycon, and installation began in Polycon's facility in January 2017. [*Id.* at ¶21.]

In the April 2016 Terms and Conditions, the parties agreed to a payment plan requiring Polycon to make progress payments to R&B. [DE 137 at ¶25.] Specifically, the Terms and Conditions provided for a 30% downpayment with the purchase order, 30% due after 50% completion of the Equipment, and additional 30% following successful operation of the Equipment at R&B's facility and prior to shipment, and the payment of the final 10% due net 30 days from successful operation of the Equipment at Polycon's facility. [DE 137 at ¶25, citing DE 59-1 at ¶5(a).] Interest on overdue accounts is set at the rate of 1% per month. [DE 137 at ¶27.]

---

[2] R&B proposes in its ¶19 that Muta "accepted the 8/16 machine on behalf of Polycon," citing Exhibit 3 to the Declaration of Fred Pearcy, R&B's President and General Manager. Pearcy's declaration has been filed in two different places in the record, DE 78-2 and DE 130-2. In both places, no Exhibit 3 is attached. The "Equipment Release For Shipment" form filed by Polycon instead may or may not be the form R&B refers to. Polycon cites ¶6 of the Terms and Conditions on "Acceptance of Equipment": "Seller's reasonable and standard installation test procedures conducted by Seller's representative *in Purchaser's facilities* shall be the criteria for machine acceptance, unless other conditions have been specified in Purchaser's order and agreed upon by Seller in writing." (Emphasis added.)]

As noted above, the combined total of the two purchase orders was approximately $4.7 million. Polycon paid the initial 30% downpayment after execution of the two purchase orders in April 2016. [*Id*. at ¶28.] Polycon made two additional payments of 30% each. [*Id*. at ¶29.] From May 2017 through July 2018, R&B attempted to negotiate a payment plan with Polycon for the remaining 10% progress payment. [*Id*. at ¶30.] Polycon has not paid the last 10% of the purchase price for the two machines. [*Id*. at ¶31.]

In opposition to R&B's summary judgment motion, Polycon has offered its own Statement of Additional Material Facts. [DE 137 at 13-27.] In its reply, R&B does not address Polycon's assertions of fact, neither in the text of R&B's memorandum nor with any Reply to Statement of Additional Material Facts as called for by N.D.Ind. L.R. 56-1(c)(2). Those facts are therefore undisputed for purposes of the present motion. The following facts are asserted by Polycon in that statement.

Material R&B provided to Polycon during the negotiation of the sale included what R&B called an "output sheet." [DE 137-5 at 3.] The material states that the 8/16 machine could produce "2 ½ Gallon Ecolab" bottles at the rate of 32 per minute, with a "max output" of 1,920 per hour and 46,080 per day. [DE 137-5 at 5.] For the 4/11 machine, the material described the output of "93 oz Capsule Ecolab" bottles as 42.3 per minute, with a "max output" of 2,538 per hour and 60,912 per day. [*Id*. at 8.]

To date, the 4/11 machine has never been able to produce acceptable bottles at a rate of 42.3 bottles per minute. [DE 137-1 at ¶14; DE 137-2 at ¶14.] At most, the 4/11

has produced 32 bottles per minute or 25% less output than promised. [DE 137-1 at ¶14; DE 137-2 at ¶15.] For its part, the 8/16 machine has never been able to produce acceptable bottles at a rate of 32 bottles per minute. [DE 137-1 at ¶13; DE 137-2 at ¶16.] At most, the 8/16 has produced 27 bottles per minute. [DE 137-1 at ¶13; DE 137-2 at ¶17.]

Polycon relied upon R&B's specifications and descriptions of the output of the 4/11 and 8/16 machines in deciding whether to purchase those machines or to purchase equipment from another manufacturer. [DE 137-2 at ¶5.]

## Discussion

### R&B's Counterclaim for Breach of Contract

A breach of contract claim under Indiana law requires the existence of a contract, a breach of the contract, and resulting damages. *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021). R&B contends that Polycon owes it $471,000, the remaining 10% of the purchase price of the two machines (the total of $172,500 for the 4/11 machine and $298,500 for the 8/16 machine), and that the failure to pay is a breach of the parties' contract. The pertinent provision of the Terms and Conditions requires a final progress payment of "10% due net 30 days from successful operation of the Equipment at Purchaser's facility." [DE 132-1 at §5(a)(4).] R&B asserts that since the December 2016 installation of the machines, "Polycon has successfully operated the 4/11 and 8/16 machines to produce millions of bottles for sale to Polycon's customers." [DE 137 at ¶24.]

Polycon counters that "R&B has failed to designate any evidence whatsoever that would show that the machines successfully operated at Polycon's facility." [DE 136 at 7.] Although Polycon acknowledges that it has used the machines to produce bottles that were sold to its customers, it contends that "successful operation" also required "the performance capability to makes these bottles at the rate R&B represented," a standard not yet met. [DE 136 at 5.] Polycon cites Section 3 of the Terms and Conditions, which provides that R&B warrants that the equipment "conform to all specifications drawings, samples, and descriptions given." [DE 132-1 at §3(a).] This standard, R&B argues in reply, does not require that the machines were free of all defects, and that, instead of perfection, the parties contracted for an express warranty to remedy any defects, without compromising R&B's entitlement to be paid for the machines. [DE 130 at 10.]

The rubber meets the road in this case with the answer to the following question: what does the phrase "successful operation" of the machines at the Polycon facility mean exactly? That is what triggers the obligation to make the final payment. [DE 132-1 at §5(a)(4).] A question not addressed by the parties, but raised by their rival positions, is whether that term of the contract is ambiguous, which would impact whether the issue can be resolved on summary judgment. Although "[c]ases involving contract interpretation generally are particularly appropriate for summary judgment,...'[w]hen the terms of a contract are ambiguous or uncertain, however, and its interpretation requires extrinsic evidence, its construction is left to the factfinder.'" *Celadon Trucking*

8

*Svcs, Inc. v. Wilmoth*, 70 N.E.3d 833, 842 (Ind.Ct.App. 2017), quoting *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840 (Ind.Ct.App. 2016). *See also Community Construction LLC v. Posterity Scholar House, LP*, 203 N.E.3d 1069, 1078 (Ind.Ct.App. 2023) (same).

"Successful operation" is not defined in the parties' agreement.  And let's be honest about it, the adjective "successful" is a rather pliable term. It's certainly a much more subjective inquiry than an objective one, and this all favors a conclusion that the phrase is ambiguous.  The test for ambiguity is not merely whether the parties to this action disagree about the term's meaning, but whether reasonable people could reach different conclusions as to its meaning.  *Shoaff v. First Merchants Bank*, 201 N.E.3d 646, 653 (Ind.Ct.App. 2022).  Both are true here.  It's not unreasonable for the buyer of the machines, which says it relied on particular projections about the machines' output in making the purchase, to believe their operations are not successful unless those targets are met.  More generally, a reasonable person could conclude that "successful" operation requires more than mere "operation" (without the adjective), including meeting expectations about the qualitative or quantitative performance of the machines. On the other hand, it is not unreasonable for the manufacturer to believe the machines are successfully operating if they produce a reasonable quantity and quality of saleable product, without regard to any particular requirements.  As earlier suggested, the ambiguity arises from the inherent subjectivity of the word "successful."  Reasonable

parties can disagree about what is minimally required to make the machines' operation "successful."

When construing a contract, the court "review[s] the agreement in its entirety," not merely particular phrases, with a goal to harmonize all its provisions. *U.S. Automatic Sprinkler Corporation v. Erie Insurance Exchange*, 204 N.E. 3d 215, 223 (Ind. 2023). To that end, I have searched the Terms and Conditions for any other use of the same phrase to determine whether that provides greater clarity as to its meaning. The immediately preceding subsection of the provision on progress payments requires a 30% payment "following successful operation of the Equipment at Seller's facility and prior to shipment." [DE 132-1 at §5(a)(3).]

Polycon made the third 30% progress payment called for by §5(a)(3), suggesting that it did not dispute that the standard was met under that subsection. The "dry run" of the machines at R&B's plant suggested by this language would not likely involve operation long enough to test the machines for the represented daily output of several thousand bottles, which Polycon argues is required to meet the "successful operation" standard under §5(a)(4). But what constitutes successful operation at the manufacturer's facility might differ from what constitutes successful operation at the buyer's facility for just that reason – namely the "dry run" contemplated by §5(a)(3) is a less demanding test of the equipment than after its final installation at the buyer's facility.

Looking further, I find that the term "successful operation" is used in one other provision of the document, and I consider whether that usage provides any more definite interpretation for the term. The "Warranty" provision of Section 3(a) in part defines the warranty period this way:

> Seller warrants that all Equipment and Work furnished pursuant hereto shall: (i) conform to all specifications drawings, samples, and descriptions given (the "Specifications"), (ii) be new and, for a period of one (1) years [*sic*] from the successful operation of the Equipment at Purchaser's facility (the "Equipment Warranty Period"), be free from defects in design, material, workmanship, warning and instruction[.]

The warranty period does not begin until the machines achieve "successful operation " at Polycon's facility, the same triggering event as applies to the final progress payment. Does the language's appearance in the Warranty provision suggest that, as Polycon would have it, "successful operation" here requires meeting all "Specifications" so that the warranty period begins only if (and at a point in time when) all the requirements of the warranty are at that point met? On the other hand, the warranty period could reasonably be thought to begin as soon as the machines produce bottles, even if the machines or the bottles fall short of the warranted Specifications in some way. The former reasoning makes more sense to me in light of how the provision is worded. Reading clauses (i) and (ii) together suggests that the warranty period does not begin until the machines conform to the Specifications and operate successfully at Polycon's facility.

But neither §3 nor §5(a)(3) definitively clarify the meaning of "successful operation" as used in §5(a)(4). Instead, the earlier two usages of the phrase tend to pull

11

in opposite directions, although neither conclusively, leaving §5(a)(4) just as ambiguous as when viewed in isolation.  Because I find that people can reasonably differ as to what constitutes "successful operation" of the machines within the meaning of the parties' agreement, interpretation of the phrase "is determined by examining extrinsic evidence and the contract construction becomes a matter for the factfinder." *Community Construction LLC*, 203 N.E.3d at 1078.

Indiana no longer observes a distinction between "patent" and "latent" ambiguities in contract language, with only the latter subject to resolution by the factfinder based on extrinsic evidence.  *Red Barn Motors, Inc. v. Nextgear Capital, Inc.*, Case No. 1:14-cv-01589-TWP-DKL, 2018 WL 11310944, at *7 (S.D.Ind.  Jan. 12, 2018), citing the Indiana Supreme Court's decision in *University of Southern Indiana Foundation v. Baker*, 843 N.E.2d 528 (Ind. 2006).  In *Baker*, the Indiana Supreme Court held that "the latent/patent distinction has not been consistently applied and no longer serves any useful purpose," and "where an instrument is ambiguous, all relevant extrinsic evidence may properly be considered in resolving the ambiguity."  *Id.* at 535. [3]  The construction of such ambiguous language is for the finder of fact.  *Modular Bldg. Solutions, LLC v. Fall Creek Home, LLC*, No. 1:05-CV-141 RM, 2008 WL 656273, at *7 and

---

[3] Although *Baker* involved interpretation of an inter vivos trust, the abandonment of the patent/latent distinction has been applied by Indiana courts in other contractual contexts.  *See, e.g., Maynard v. Golden Living*, 56 N.E.3d 1232, 1238 (Ind.Ct.App. 2016); *Davis v. Raytheon Technical Svs. Co.* LLC, No. 1:10-cv-1365-JMS-MJD, 2012 WL 5499416, at *4 (S.D.Ind. Nov. 13, 2012); *Auditor of Clark County v. JP Morgan Chase Bank, N.A.*, 942 N.E.2d 923 (Table), at *2 (Ind.Ct.App. Feb. 14, 2011)*; City of Kokomo ex rel. Goodnight v. Pogue*, 940 N.E.2d 833, 841 (Ind.Ct.App. 2010); *FK, Inc. v. See USA, LLC*, 928 N.E.2d 653 (Table), at *7 (Ind.Ct.App. June 18, 2010).

n.1 (N.D.Ind. March 6, 2008). R&B's motion for summary judgment on its breach of

contract claim must therefore be denied.

**Limitations on Polycon's Recovery**

On its various claims, Polycon seeks damages including:

costs due to R&B's failure to timely supply a Rotary 4/11 and Rotary 8/16
which meet the Specifications, lost profits, additional labor costs,
including overtime, expenses of wasted product, damage to its
relationship with the Customer, loss of additional orders from the
Customer, costs to repair the machines, and attorneys fees as set forth in
the Agreement.

[*Id*. at ¶¶51, 64. *See also* ¶¶90, 100, 108, 116.]  Polycon's expert identifies lost profits,

"higher costs of production," and "waste, overtime and maintenance" as categories of

damages here.  [DE 130 at 1-2.]  Hoping to eliminate these damages, R&B points me to

language in the Terms and Conditions that excludes liability for "special, consequential,

incidental, or indirect damages." [DE 130 at 1-2; DE 132-1 at §11.]

R&B seeks a determination as a matter of law that the waiver is enforceable

against these categories of Polycon's alleged damages as set forth in the report of its

damages expert.  [*Id*. at 3.] Here's the language of the Limitation of Liability provision

that R&B relies upon:

Except as specifically provided for in this Agreement, in no event shall
either party be liable for any special, consequential, incidental, or indirect
damages with respect to this Agreement or anything done in connection
herewith, whether based upon contract, tort (including negligence),
breach of warranty, strict liability, or otherwise.

[DE 132-1 at §11.]  R&B infers from this language that Polycon's recovery on any legal

theory is limited to "direct" damages.  What kinds of damages are special,

consequential, incidental, or indirect?  Once again, none of these terms is defined in the

parties' agreement.

For definitions, R&B looks to Indiana's UCC provisions.  For what constitutes

"direct" damages, R&B cites Ind. Code §26-1-2-714:

> (1) Where the buyer has accepted goods and given notification (IC 26-1-2-607(3)), he may recover as damages for any nonconformity of tender **the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.**
>
> (2) The measure of damages for breach of warranty is **the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted**, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under IC 26-1-2-715 may also be recovered.

[Emphasis added.]  This provision does not contain the word "direct" and so does not

define "direct damages."

Ind. Code §26-1-2-715 addresses a buyer's incidental and consequential damages:

> (1) **Incidental damages** resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and **any other reasonable expense incident to the delay or other breach**.
>
> (2) **Consequential damages** resulting from the seller's breach include **(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise**; and (b) injury to person or property proximately resulting from any breach of warranty.

[Emphasis added.]

14

Polycon argues that its requests "for lost profits and revenue, higher costs of production, and waste, overtime and maintenance" are properly understood as direct damages because they "were foreseeable by R&B and were directly caused by the failure of the machines to do what R&B claimed they could do." [DE 136 at 12.] Other than R&B's repeated listing of the challenged categories of damages, R&B doesn't discuss damages for higher costs of production and for waste, overtime and maintenance. Instead, R&B's argument addresses only lost profits, and urges a determination as a matter of law that they are not direct damages. Polycon responds that each of those categories of damages was "directly caused by the failure of the machines" and that even though "denominated as higher costs, overtime or maintenance...these excess expenses and expenditures decreased Polycon's profit and, therefore, constitute a lost profits claim." [DE 136 at 12.] My analysis will therefore focus on whether recovery for lost profits is precluded by the agreement's Limitation of Liability provision.

In a case involving a dispute over a similar liability limitation provision, Judge Hamilton, then of the U.S. District Court for the Southern District of Indiana, wrote that "lost profits are sometimes treated properly as direct damages and sometimes as consequential damages," with the determination turning on "the degree to which the breaching party could foresee that the other party's lost profits would be a result of its breach." *ViaStar Energy, LLC v. Motorola, Inc.*, No. 1:05-cv-1095-DFH-WTL, 2006 WL 3075864, at *2 (S.D.Ind. Oct. 26, 2006). Judge Hamilton reviewed and analyzed

numerous authorities applying Indiana law, including the Indiana Supreme Court's

decision in *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941 (Ind.

2001).

In *Rheem,* "the court ordered summary judgment in favor of a defendant who

sought to exclude the plaintiff's claimed lost profits where the contract contained an

express provision excluding incidental and consequential damages." *ViaStar*, 2006 WL

2075864, at *3. But as *ViaStar* explains, the *Rheem* court "did not hold that lost profits

are always consequential damages," but instead "that Indiana's version of the Uniform

Commercial Code did not categorically invalidate an exclusion of consequential

damages when a limited remedy failed of its essential purpose." *Id.*, citing *Rheem*, 746

N.E.2d at 947. Judge Hamilton formulates an "organizing principle" based on the

"canonical case on consequential damages," *Hadley v. Baxendale*, 9 Exch. 341, 156

Eng.Rep. 145 (1854). His conclusion is that *Hadley* "stands for the principle that lost

profits are not recoverable when the loss was not a foreseeable consequence of the

breach." *ViaStar*, 2006 WL 2075864, at *3. So under Indiana law, determining whether

lost profits are considered direct damages in this case depends on the foreseeability of

the lost profits resulting from R&B's breach. *Id.* at *2.

Here the lost profits are sought by the buyer rather than the seller, a situation in

which "the lost profits of the buyer can seem more speculative and uncertain." *Id.* at *4.

*ViaStar* suggests that "in determining whether lost profits are a foreseeable result of a

breach, it is important to look at the language of the contract itself to determine the

intention of the parties." *Id.* at *5, citing *Rexnord Corp. v. DeWolff Boberg & Assoc., Inc.*, 286 F.3d 1001, 1004-05 (7th Cir. 2022), and *Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1071 n.5 (8th Cir. 2000). In *ViaStar*, the contract required the parties to agree on reasonable sales forecasts "for the purpose of determining a cap on damages before they know who might be claiming breach." *ViaStar*, 2006 WL 2075864, at *6. This was "a clear expression of intent that lost profits on those sales would be a reasonably foreseeable consequence of at least some breaches of the Agreement." *Id.* Although Polycon cites *ViaStar*, Polycon does not cite any "language of the contract [that] indicates that the parties contemplated lost profits as a probable result of breach," which would support lost profits as "a form of direct damages." *ViaStar*, 2006 WL 2075864, at *5.

Instead Polycon argues that R&B's representations about output capacity during contract negotiations should be considered incorporated into the contract and "establish[] the foreseeability of damages for not meeting them." [DE 136 at 18.] The parties' dispute about the foreseeability of this type of damages puts the matter beyond the reach of summary judgment. "The issue of foreseeability of damages is generally to be determined by the trier of fact." *WESCO Distribution, Inc. v. Arcelormittal Indiana Harbor LLC*, 23 N.E.3d 682, 710 (Ind.Ct.App. 2014). *See also Karma International, LLC v. Indianapolis Motor Speedway, LLC*, 938 F.3d 921, 927 (7th Cir. 2019). In the absence of contract definitions, I am unable in the context of summary judgment to decide whether the sorts of damages R&B challenges were foreseeable, and therefore were direct versus

special, consequential, incidental or indirect.  The contract language alone does not support the determination R&B seeks on summary judgment.  I will give some consideration to the parties' other arguments to see if any of them clarify the application of the Limitation of Liability.

Under Indiana's UCC, the parties may by contract limit the remedies otherwise available under the statute.  Ind. Code §26-1-2-719(1)(a).  An exception is made "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose," in which event "remedy may be had as provided in IC 26-1." *Id*. at §26-1-2-719(2).  The statute also provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." *Id*. at §26-1-2-719(3).  R&B argues that the parties' agreed Limitation of Liability is not unconscionable, and that Polycon cannot demonstrate that the limited remedies fail of their essential purpose.

Unconscionability is a matter to be determined by the court.  *Rheem*, 746 N.E.2d at 948.  Polycon does not contend that the Limitation of Liability is unconscionable (although it says it does not concede the issue – DE 136 at 21), but rather argues that lost profits and the other types of damages R&B challenges are, in fact, direct damages that are not subject to the agreement's exclusions.  [DE 136 at 12-14.]  On this point, I have earlier explained that the question turns on foreseeability, which is for a jury to determine.  To the extent I need to consider unconscionability when Polycon does not argue the point, I do not find that the Limitation of Liability is unconscionable.

Ruling out special damages, but leaving the buyer with direct damages and other UCC remedies such as repair, replacement or refund (even if at the seller's option under §3(f)) is not "oppressively one-sided and harsh," as would constitute substantive unconscionability. *Doe v. Carmel Operator, LLC,* 144 N.E.3d 743, 753 (Ind.Ct.App. 2020), reversed in part on other grounds in 160 N.E.3d 518 (Ind. 2021); *Hahn v. Ford Motor Co., Inc.*, 434 N.E.2d 943, 951 (Ind.Ct.App. 1982). I see no indication that Polycon was not in a position to shop around for better terms if they were wanted. *Andersen v. Thor Motor Coach, Inc.*, 402 F.Supp.3d 467, 478 (N.D.Ind. 2019). "Indiana courts have rejected claims that contractual limitations of remedy are substantively unconscionable." *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078,, 1087 (Ind. 1993); *Hahn*, 434 N.E.2d at 951.

A finding of procedural unconscionability arises "from irregularities in the bargaining process or from characteristics peculiar to one of the parties." *DiMizio v Romo*, 756 N.E.2d 1018, 1024 (Ind.Ct.App. 2001). Such a conclusion is not supported by an agreement between two sophisticated business entities with long histories in the industry negotiating over a substantial period of time. As the Seventh Circuit has observed, "Indiana courts have long recognized and respected the freedom of parties to enter into contracts and have presumed that those contracts represent the freely bargained agreements of the parties." *SAMS Hotel Group, LLC v. Environs, Inc.*, 716 F.3d 432 (7th Cir. 2013). Standards of unconscionability are hard to meet, and are not shown to be met in this case. *Jackson v. Bank of America Corp.*, 711 F.3d 788, 792 (7th Cir. 2013).

Polycon also argues that in any event R&B' warranty has failed of its essential purpose so that under 26-1-2-719(2) all UCC remedies are available despite the limitation provision in the Terms and Conditions.  [DE 136 at 21.]  Polycon cites *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 642 (Ind.Ct.App. 2004), and argues that "it is clear that R&B's warranty *has* failed of its essential purpose" because attempted repairs for over a year have "*never* been able to achieve reliable production from the machines at the output rates promised."  [DE 136 at 21 (emphases in original).]  But whether a limited remedy fails of its essential purpose is an issue of fact for a jury to determine. *Rheem*, 746 N.E. 2d at 948, citing *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1063 (5th Cir.1982).

Furthermore, as R&B points out, a failure of warranty's essential purpose has no impact on limitations as to damages, as opposed to the availability of various remedies. [DE 130 at 18.]  Courts have said that "[l]imitations of remedy are not favored in Indiana and are strictly construed against the seller on the basis of public policy." *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 643 (Ind.Ct.App. 2004), citing *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1085 (Ind. 1993).  But the Indiana Supreme Court in *Rheem* cites Ind. Code §26-1-2-719(3)'s provision that consequential damages can be excluded unless unconscionable.  746 N.E.2d at 946.  Remedies are options for relief including cancel, cover, replacement, repair, and damages.  Limitations on damages in particular are not necessarily treated the same as limitations as to available remedies.  Indiana law makes this clear.

In *Rheem*, the Indiana Supreme Court agreed that "the failure of a limited remedy has no effect on an exclusion of consequential damages." *Id.* at 947. *Rheem* is often cited for this principle. *See, e.g., Castagna v. Newmar Corporation*, 340 F.Supp.3d 728, 743 (N.D.Ind. 2018) (whether a warranty failed of its essential purpose is "not a ground for declining to enforce a limitation or exclusion of consequential damages"); *Swan Lake Holdings, LLC v. Yamaha Golf Cart Company*, No. 3:09-CV-228-PPS, 2010 WL 3894576, at *7 (N.D.Ind. Sept. 27, 2010) ("whether a limited remedy fails of its essential purpose has no bearing on the analysis of the effectiveness of an attempt to exclude consequential damages"); *Skodras v. Gulf Stream Coach, Inc.*, Cause No. 3:08CV441,  No. 2010 WL 145370, at *6 (N.D.Ind. Jan. 8, 2010) ("Under Indiana law, the enforceability of liability limitations is reviewed independently from any analysis of whether the limited remedies provided by the parties' agreement fail in their essential purpose."). So Polycon's argument does not defeat the effect of the Limitation of Liability provision in the parties' agreement.

Next, R&B argues that Polycon cannot recover incidental or consequential damages against it under an indemnification theory because their agreement's indemnification clause applies only to third-party claims. [DE 130 at 19.] I agree, although with the application of Section 11 still otherwise uncertain, this determination does not foreclose Polycon's recovery of damages for lost profits. Section 9(a) of the Terms and Conditions on Indemnification reads: "*General*. Seller shall indemnify and hold harmless Purchaser...for and from all suits, claims, judgments, awards, losses,

damages, costs or expenses (including attorneys' fees) relating to, arising out of, or caused by the Equipment, Seller's performance of any Work hereunder or any act or omission of Seller." [DE 132-1 at §9(a).]  None of this language expresses an intent that R&B would indemnify Polycon for claims against R&B *by Polycon.*

The generally accepted "legal understanding of indemnity clauses" is that they cover specified liabilities of the indemnitee *to third-parties. Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 967 (Ind.Ct. App. 2013).  *See also L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1047 (Ind.Ct.App. 2012).  Indiana strictly construes indemnification clauses and "the intent to indemnify must be stated in clear and unequivocal terms."  *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1132 (Ind. 1995).  So although first-party indemnification – "one party agreeing to indemnify the other party for first-party claims arising between those parties" – is possible, the language must plainly express such an intention.  *Flaherty*, 990 N.E.2d at 967.  There is no such unequivocal language in the Indemnification clause here.

By contrast, in *Sequa Coatings Corp. v. NICTD*, 796 N.E.2d 1216, 1229 (Ind.Ct.App. 2003), the indemnity provision "expressly stated that it applied to, among other things, 'any and all Causes of Action, as defined above, asserted by *any parties and non-parties to this Agreement....*'" *L. H. Controls*, 974 N.E.2d at 1048 (emphasis added in *L.H.*).  *L.H. Controls* cites another example found in *Fackler v. Powell*, 891 N.E.2d 1091, 198 (Ind.Ct.App. 2008), in which the dissolution property settlement agreement provided that each party would "indemnify and save and hold *the other* harmless...." *L.H.*

*Controls*, 974 N.E.2d at 1048 (emphasis added).  Section 9(a) of the Terms and Conditions contains no similar language.

Polycon suggests that §9(a) should be construed in contrast to §9(d), which Polycon says "used narrowly tailored language that limits indemnification to damages arising under an IP Claim which could only come from a third-party."  [DE 136 at 24.] The two provisions do not lend themselves to Polycon's interpretation and the argument is not at all persuasive.  In contrast to §9(a), Polycon, rather than R&B, is the party granting indemnification under §9(d)  ("Intellectual Property Indemnity by Purchaser").  There is no express language identifying third-party versus first-party claims in §9(d), so I disagree with Polycon's "narrowly tailored language" characterization.  The fact that the particular type of claim addressed in that section (intellectual property claims)  would only be made by a third party does not rationally impact the interpretation of the general language of §9(a).  As in *L.H. Controls*, in the absence of clear and unambiguous language indicating that §9(a) is an agreement to first-party indemnity,  "it is appropriate to hold that the provision applies only to third-party claims, in accordance with the traditional legal understanding of indemnity provisions."  *Id.* at 1048.

R&B has not demonstrated an entitlement to a determination as a matter of law that the Limitation of Liability in §11 of their agreement precludes Polycon's recovery of lost profits,  higher costs of production, waste, overtime and maintenance, although I

23

find as a matter of law that such a recovery cannot be supported by the Indemnification provision of the parties' Terms and Conditions.

**ACCORDINGLY:**

R&B Plastics Machinery LLC's Motion for Summary Judgment [DE 129] is DENIED.

**SO ORDERED**.

ENTERED: April 17, 2023.

    /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT