UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| POLYCON INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff & Counter-Defendant, | ) |
| | ) |
| v. | ) Case No. 2:19-CV-485-PPS |
| | ) |
| R&B PLASTICS MACHINERY, LLC, | ) |
| and MONROE MOLD, LLC, | ) |
| | ) |
| Defendants & Counterclaimants. | ) |

**OPINION AND ORDER**

When a warranty commences upon the "successful operation" of a machine, what exactly does that mean? That question is at the center of this dispute involving three players in the plastic bottle manufacturing process. Polycon Industries manufactures "blow molded" plastic bottles and containers. R&B Plastics Machinery designs, manufactures, and installs the machines that make blow molded containers. And Monroe Mold designs, manufactures, and installs the molds required in the process. The present litigation arises from Polycon's purchase of two blow molding machines from R&B and molds for those machines from Monroe Mold. Polycon's basic contention is that they were sold underperforming machines by R&B.

Polycon's First Amended Complaint contains claims against R&B for breach of contract, breach of express warranties, first party indemnity, and fraud in the inducement, as well as claims against Monroe for breach of contract, breach of an implied warranty of merchantability, and breach of an implied warranty of fitness for a

1

particular purpose.[1] Polycon and R&B agreed to an express warranty for one year that commenced, as noted at the outset, upon the "successful operation" of the machines Polycon purchased from R&B. There are also counterclaims at issue in the case: R&B claims that Polycon failed to pay all of its bill—they're short $471,000.00 (excluding interest) on the purchase agreement, says R&B.

Before me now is R&B's third attempt at partial summary judgment, this time concerning Polycon's warranty claims against R&B and R&B's counterclaim against Polycon. I previously denied R&B's second motion for partial summary judgment on the basis that the contractual language at issue was ambiguous and numerous questions of fact remained. [DE 152.] Because this latest motion deals with the same ambiguous contractual language ("successful operation"), albeit in a different section of the contract, and relies upon extrinsic evidence, R&B's Motion for Partial Summary Judgment will be DENIED. [DE 174.]

Also, as I will discuss at the end of this Opinion, because of its relevance to damages and the ongoing discussions concerning the possibility of a bifurcated trial, I will also at this time DENY WITHOUT PREJUDICE R&B's Motion in Limine concerning Polycon's damages expert. [DE 168.]

## Factual Background

As usual, I'll start with the facts, many of which remain the same as in my April 2023 Opinion that denied R&B's second motion for partial summary judgment. But in

---

[1] I previously granted R&B summary judgment on the claim for fraud in the inducement. [DE 107.]

this latest attempt at partial summary judgment, R&B has put forth additional undisputed facts that I did not have before me during the first go around. While somewhat repetitive, given the complicated nature of the contractual and warranty issues, I will briefly recite the core facts of this dispute, including the new undisputed facts.

For more than 50 years, Polycon has been in the business of manufacturing blow-molded plastic bottles. Polycon sold plastic bottles to an outfit named Ecolab beginning in 1980 but lost this business to a competitor in 2010. [DE 195 at ¶11.] In 2016, Polycon decided to make a bid to recapture the Ecolab business it had previously lost. [*Id.* at ¶12.] By this time, Ecolab had changed the process by which its bottles got "qualified"—meaning the testing process bottles must undergo before Ecolab would accept them. [*Id.* at ¶¶12–13.] Polycon disputes R&B's characterization of witness testimony as indicating that Ecolab's qualification tests were more "demanding", but Polycon does not dispute that Ecolab changed its qualification standards. [*Id.* at ¶¶12–14.] Polycon attempted in early 2016 to produce qualified 93 oz containers on its existing Uniloy machines. [*Id.* at ¶23.] But after nine months of attempts, by November 2016, Polycon still had not been able to produce a 93 oz container acceptable to Ecolab. [*Id.* at ¶24.]

Around the same time, Polycon and R&B negotiated a contract under which R&B would design and build two blow-molding machines for Polycon, referred to as the "8/16 machine" and the "4/11 machine." [*Id.* at ¶25.] Polycon's Vice President of

3

Operations and CEO Bill Hansen negotiated on behalf of Polycon, and R&B's President Fred Piercy negotiated on behalf of R&B. [*Id*. at ¶26.] Polycon intended to use the 4/11 machine to manufacture a 93 oz Ecolab capsule on "Line 2" of its manufacturing facility. [*Id*. at ¶1.] And Polycon intended to use the 8/16 machine to manufacture a 2.5-gallon Ecolab container and a 2.5-gallon Polycon "stock" container on "Line 0" of its manufacturing facility. [*Id*.]

Based on these negotiations, on March 4, 2016, R&B sent Polycon proposal number PM 16-4066, in which R&B agreed to supply Polycon with the 8/16 machine in exchange for a total purchase price of $2,985,000. [DE 137 at ¶5.] On April 11, 2016, R&B sent Polycon proposal number PM 16-3978B, in which R&B agreed to supply Polycon with the 4/11 machine for a total purchase price of $1,725,000. [*Id*. at ¶6.] The Parties finalized the deal a few days later when they executed a Terms and Conditions of Sale agreement, which both parties had the opportunity to review, revise, and separately sign. [*Id*. at ¶7.] After execution of the Terms and Conditions, Polycon sent R&B two purchase orders—one for the 8/16 machine and the other for the 4/11 machine. [*Id*. at ¶8.]

Turning back to the Terms and Conditions, R&B disclaimed the warranties of merchantability and fitness for a particular purpose opting instead for the following warranty provided in Paragraph 3(a):

> Seller warrants that all Equipment and Work furnished pursuant hereto shall: (i) conform to all specifications drawings, samples, and descriptions given (the "Specifications"), (ii) be new and, for a period of one (1) years from the ***successful operation*** of the Equipment at Purchaser's facility (the

4

> "Equipment Warranty Period"), be free from defects in design, material, workmanship, warning and instruction . . . .

[DE 195 at ¶4, quoting DE 185-3 at ¶3(a) (emphasis added).] This is the warranty provision that is at issue in this case.

During the one-year Equipment Warranty Period, to begin upon the "successful operation of the Equipment" at Polycon's facility, R&B agreed to the following:

> Seller will (i) at Seller's option and at Seller's sole cost and expense, repair or replace the Equipment or part that does not conform to the warranty or description herein contained, or refund the purchase price of such Equipment or part, and (ii) at Seller's sole cost and expense, provide qualified technical consultation by phone, written correspondence or with field service as reasonably necessary to resolve any warranty issue.

[*Id*. at ¶5, quoting DE 185-3 at ¶3(f).]

Polycon does not appear to dispute that the Terms and Conditions did not include a provision mandating that R&B produce qualified bottles for Ecolab, an understanding that appears to be supported by deposition testimony of Bill Hansen. [*Id*. at ¶27.] Likewise, the Parties agree that R&B's obligations for "In-Field Installation" in the proposal and purchase order for the 4/11 machine did not include producing qualified containers. [*Id*. at ¶30; DE 186-3 at 7.] In fact, the "In-Field Installation" language in the 4/11 machine proposal states the contrary: "Line Items <u>does not include</u> producing 'qualified containers'[.]" [DE 186-3 at 7 (emphasis in original).] The proposal and purchase order obligations for the 8/16 machine, however, differ from those for the 4/11 machine. [DE 195 at ¶32.] The 8/16 proposal *did* require R&B personnel to

5

manufacture "qualified containers based upon Polycon Industries 2-1/2 gallon container specifications." [DE 186-3 at 11.]

Beginning in January 2017, shortly after R&B installed the 4/11 and 8/16 machines at Polycon's facility, Polycon asked for and received numerous "warranty repairs" from R&B free of charge. [DE 195 at ¶¶6–7.] R&B claims, and Polycon does not dispute, that it expended over $310,000 in making these repairs to the 8/16 and 4/11 machines from January 2017 to May 2018. [*Id.* at ¶8.] However, Polycon disputes that these warranty repairs fulfilled R&B's contractual obligations as to the warranty provision in Section 3(a). [*Id.* at ¶¶6–8.]

The Parties disagree over the nature of various statements made in January and February 2017 concerning initial production of bottles by the 4/11 and 8/16 machines. [DE 197 at ¶¶40–43.] But the Parties agree that in March and April 2017 the 8/16 machine was producing 2.5-gallon containers that were qualified by Ecolab and by April 18, 2017, the 4/11 machine was producing 93-oz capsules that were also qualified by Ecolab. [DE 195 at ¶¶45–46.] But the Parties dispute whether their agreement included a minimum output rate for the machines and, accordingly, whether the machines ever hit that minimum rate. [*Id.* at ¶¶48–50.]

In opposition to R&B's summary judgment motion, Polycon has offered its own Statement of Additional Material Facts. [*Id.* at ¶¶94–220.] R&B's response to Polycon's Statement of Additional Material Facts highlights critical additional factual disputes between the Parties concerning the origin and relevance of the "Rotary Outputs" sheet

6

that R&B provided to Polycon and that Polycon says formed part of the basis of their contract concerning minimum output rates for the machines. [DE 217 at ¶¶95–100.] According to Polycon, those "output sheets" promised that the 4/11 machine would produce 42.3 bottles per minute, while the 8/16 machine would produce 32 bottles per minute. [DE 218 at ¶102.] R&B adamantly denies this suggesting that these numbers were a "best case scenario" and were never meant to represent the output of the machines running 24 hours a day, seven days a week. [*Id*.] And therein lies the rub in this case—were the output numbers contained in the specifications promises or estimates?

## **Discussion**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted).

As I suggested at the outset, the core of this dispute is whether the machines achieved "successful operation" according to the terms of the Parties' agreement. This

7

overarching question requires that I answer two threshold questions. First, did the one-year "Equipment Warranty Period" commence because the machines achieved "successful operation"? And if the answer to this first question is yes, when did the Equipment Warranty Period start? I will begin with the first question below.

## I.      "Successful Operation" / Commencement of Equipment Warranty Period

Recall that the triggering event for the one-year Equipment Warranty Period is when the machines achieve "successful operation" at Polycon's manufacturing facility. [DE 195 at ¶4, quoting DE 185-3 at ¶3(a).] Accordingly, I must first determine the nature of the Parties' understanding of the meaning of the phrase "successful operation."

R&B puts forth several arguments to support its claim that the Equipment Warranty Period started long ago. First, R&B argues that "the warranty period must have started because Polycon requested and accepted free repairs under the warranty." [DE 175 at 21.][2] Second, R&B argues that "successful operation" did not require the machines to satisfy the 42.3 and 32 bottles per minute ("BPM") output rates for Ecolab containers contained in the "Rotary Outputs" sheet in Exhibit 2 to Polycon's Amended Complaint. [*Id*. at 23; DE 39-2.] Instead, R&B argues that Polycon anticipated that the machines would achieve 75% of these BPM figures, which R&B asserts the machines did in fact achieve at Polycon's facility. [DE 175 at 23–24.] R&B adds that Polycon could not have achieved the max BPM figures because of choices it made concerning the

---

[2] This Opinion cites to the blue docket page numbers at the top of the page for DE 175 and not to the page numbers R&B included on the bottom of the page.

operation of the machines, such as using warmer water to chill the molds. [*Id.* at 24.] R&B points out that it never promised that its machines would make bottles that were qualified for sale to Ecolab, so this could not have been part of the understanding of "successful operation." [*Id.*] Finally, R&B argues that Polycon's use of R&B's machines to produce and sell tens of millions of bottles to Ecolab is convincing evidence that the machines plainly achieved successful operation. [*Id.* at 22.]

In response, Polycon argues that the term "successful operation" is ambiguous and therefore must be resolved by a jury. [DE 194 at 19.][3] Polycon cites to my previous opinion from April 2023, concerning R&B's second motion for summary judgment [DE 129], in which I determined that a different usage of the term "successful operation" in the Terms and Conditions was ambiguous. [DE 194 at 19, citing DE 152 at 9–10.] According to Polycon, nothing has changed since my prior ruling on this question. Polycon then lists several purported genuine issues of material fact relevant to the understanding of "successful operation" that it argues bar summary judgment. [DE 194 at 21.] According to Polycon, these genuine issues of material fact include whether R&B represented that the machines would achieve the max BPM included on the "Rotary Outputs" sheet and whether, and to what extent, Polycon relied upon R&B's recommendations concerning operation of the machines. [*Id.* at 24–29.]

---

[3] As with DE 175, this opinion cites to the blue docket page numbers at the top of the page for DE 194 and not to the page numbers Polycon included on the bottom of the page.

Both Parties assert numerous arguments and citations to the record that they say evidence the meaning of "successful operation." But at the outset, I must again return to the question of whether the term "successful operation" is ambiguous based on the four corners of the Parties' contract. "Construction of the terms of a written contract generally is a pure question of law", but if "a contract is ambiguous, the parties may introduce extrinsic evidence of its meaning, and the interpretation becomes a question of fact." *Celadon Trucking Svcs, Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind.Ct.App. 2017). When extrinsic evidence is required to understand a term, the contract's "'construction is left to the factfinder.'" *Id.* at 842 (quoting *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840 (Ind. Ct. App. 2016)). "'A word or phrase is ambiguous if reasonable people could differ as to its meaning'", but "[a] term is not ambiguous solely because the parties disagree about its meaning." *Id.* at 839 (quoting *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016)). "When summary judgment is granted based on the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that any contract ambiguity can be resolved without the aid of a factual determination." *Rusnak*, 55 N.E.3d at 840–41.

As discussed, I previously considered the term "successful operation" in April 2023. R&B pointed out during oral argument on this motion that my April 2023 opinion considered the use of "successful operation" in Section 5(a)(4) of the Terms and Conditions of Sale, which is a different provision than the warranty at issue here in Section 3(a). True enough, but in construing Section 5(a)(4) I looked to other uses of

10

"successful operation" in the Terms and Conditions of Sale, including in Section 3(a). I concluded that "neither §3 nor §5(a)(3) definitively clarify the meaning of 'successful operation' as used in §5(a)(4)" and in fact "tend[ed] to pull in opposite directions." [DE 152 at 11–12.] I did not definitively conclude that "successful operation" as used in Section 3(a) was vague, but I did note the existence of two rival interpretations of the term in that Section. [*Id*. at 11.]

So, what, if anything, has changed since the last time I confronted this question? According to Polycon, nothing. For its part, R&B tells me the undisputed facts gathered since my prior opinion demonstrate that Polycon requested and received warranty repairs from R&B, never expected to achieve the max BPM output rates, and Polycon witnesses admitted in deposition testimony that the machines achieved successful operation. [DE 216 at 3–4.] R&B argues that these new facts demonstrate that the Parties understood "successful operation" to mean 75% of the BPM figures in the "Rotary Outputs" sheet, and that R&B's machines achieved this figure at Polycon's facilities by at least May 11, 2017.

But these arguments all rely upon extrinsic evidence to define "successful operation" and, in doing so, wander into the domain of the fact finder. *Rusnak*, 55 N.E.3d at 840 ("When the terms of a contract are ambiguous or uncertain, however, and its interpretation requires extrinsic evidence, its construction is left to the factfinder."). "Extrinsic evidence is evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties

11

or the circumstances surrounding the agreement." *CWE Concrete Const., Inc. v. First Nat'l Bank*, 814 N.E.2d 720, 724 (Ind.Ct.App.2004), *trans. denied* 831 N.E.2d 739 (Ind.2005). On summary judgment, my role is limited to contract interpretation based on the language of the contract itself, constructing that language "so as not to render any words, phrases, or terms ineffective or meaningless." *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind.Ct.App.2007). As before when interpreting Section 5(a)(4), I find that the term "successful operation", as used in Section 3(a) is too murky and cannot be defined without the aid of a factual determination.

At the center of the Parties' dispute is the agreed upon BPM output rate for each machine. Let's review the warranty in Section 3(a) again to determine why, and how, the BPM rate is relevant:

> Seller warrants that all Equipment and Work furnished pursuant hereto shall: (i) conform to all specifications drawings, samples, and descriptions given (the "Specifications"), (ii) be new and, for a period of one (1) years from the successful operation of the Equipment at Purchaser's facility (the "Equipment Warranty Period"), be free from defects in design, material, workmanship, warning and instruction . . . .

[DE 195 at ¶4, quoting DE 185-3 at ¶3(a).]

Section 3(a) does not explicitly refer to any BPM rates to define the expectations for "successful operation", but it does require the machines to conform to "all specifications, drawings, samples, and descriptions given." As I mentioned in my April 2023 opinion, one interpretation of Section 3(a) is that "successful operation" required the machines to meet all "specifications, drawings, samples, and descriptions" before the warranty period began.

So, what were these "specifications, drawings, samples, and descriptions" that the machines had to conform to? The Parties agree that their contract concerning the machines includes the following documents: (1) the Terms and Conditions of Sale; (2) the 4/11 Proposal; (3) the 4/11 Purchase Order; (4) the 8/16 Proposal; and (5) the 8/16 Purchase Order. However, the Parties differ in their view of the relevance of the "Rotary Output" sheet, Exhibit 2 to Polycon's Amended Complaint, that R&B Provided to Polycon. Given this disagreement, I'll first look to the documents that the Parties do not contest as forming the basis of their contract.

A review of the 4/11 machine proposal [DE 186-3 at 3–8] and the 8/16 machine proposal [*Id*. at 9–14] does nothing to elaborate on the definition of "successful operation" as it relates to agreed-upon BPM figures. I could find no mention of expected BPM output in the proposals for either machine. Both proposals contain information concerning "In-Field Installation" of the machines, Item #7 on the 4/11 proposal [*Id*. at 7] and Item #5 on the 8/16 proposal [*Id*. at 12], but these instructions do not mention achieving certain BPM outputs as a component of installation.

Similarly, the 4/11 purchase order [DE 186-4 at 1–6] and 8/16 purchase order [*Id*. at 7–10] do not mention BPM output, including in their "In-Field Installation" sections. Nor do they provide any further guidance on the understanding of "successful operation" as used in the Terms and Conditions of Sale. The installation instructions provide certain specific instructions to take place during installation, such as R&B providing mechanical and electrical service personnel, and "[u]pon completion of

13

installation", such as wake-up, dry-cycle, and debugging. [*Id*. at 6, 10; DE 186-3 at 7, 12.] But ultimately the installation instructions in the purchase orders and proposals for both machines are silent as to the meaning of "successful operation", including whether that meaning required achievement of some minimum BPM output.

On the one hand, the absence of any mention of a minimum BPM output in the Terms and Conditions, proposals, and purchase orders could mean that the Parties did not understand achieving a certain BPM rate to be a condition for successful operation of these machines. On the other hand, the purchase orders and proposals could be interpreted to concern only the "installation" and initial testing of the machines, as the language suggests, while "successful operation" and triggering of the warranty provision could be understood as a separate provision with separate requirements specific to expectations for operating the machines after initial set-up is complete.

I have yet to mention one additional document relevant to the analysis: the "Rotary Outputs" sheet R&B provided Polycon. Because the meaning of "successful operation" is not any clearer based on my review of the Terms and Conditions, proposals, and purchase orders, I'll next analyze this additional potential source of "specifications, drawings, samples, and descriptions" referenced in Section 3(a) of the Terms and Conditions. As noted above, the "Rotary Outputs" sheet lists an "OUTPUT PER MINUTE" of 42.3 bottles for the 4/11 machine and 32 bottles for the 8/16 machine. [DE 39-2.] The word "MAX" is not listed in this "OUTPUT PER MINUTE" figure, but the next two lines, "MAX OUTPUT PER HOUR" and "MAX OUTPUT PER DAY", use

14

these per minute figures for their calculations. [*Id*.] This suggests that the output per minute figures represent the "max" output per minute.

But did "successful operation" require that the machines achieve these "max" BPM figures, and, if so, for how long? Again, the Terms and Conditions are silent on this question. As discussed, so are the proposals and purchase orders for both machines. Even assuming that Section 3(a) incorporates the Rotary Outputs sheet as a "specifications, drawings, samples, and descriptions", it is not clear whether the BPM figures represent some "max" output rate or the output rate required to achieve "successful operation." Polycon contends that "successful operation" under Section 3(a) requires the machines to have hit the max BPM figures in the "Rotary Outputs" sheet. R&B argues that these figures were "max" estimated outputs that could be achieved under perfect conditions and, even at these perfect world rates, could not be maintained on a 24/7 basis. I find it to be a reasonable interpretation that the Parties considered the "Rotary Outputs" sheet in some form as part of their understanding of "successful operation" in Section 3(a). But it is not clear to what extent the Parties did so, and the language of "successful" leaves this an open and ambiguous question.

Finally, R&B asserts one contract interpretation argument concerning the definition of "successful" that does not require extrinsic evidence, but this too fails. R&B argues that the dictionary definition of "successful" is not the same as the dictionary definition of "perfect." [DE 216 at 2–3.] According to R&B, it follows that "successful operation" could not mean that the machines had to achieve their max BPM rates

15

because those rates represent the BPM output under "perfect" conditions. While this makes sense in the abstract, the problem for R&B remains that my finding that "successful" does not mean "perfect" doesn't solve the problem of understanding what "successful" means in this context; it is a recognition of what "successful" does *not* mean. Attempts to define the meaning of "successful" by pointing to what it does not mean gets us no further in understanding the foundational question of the Parties' understanding of "successful operation."

Ultimately, I agree with Polycon that the BPM rate the Parties agreed upon, a central component of the definition of "successful operation", is a genuine issue of material fact. [*See* DE 195 ¶48.] The terms of the contract, and the specifications previously exchanged by the Parties upon which the Section 3(a) warranty provision relies, do not clearly define what BPM, if any, the machines must reach to achieve "successful operation." It will be up to a jury to determine this fundamental question.

## II.     R&B's Breach of Contract Counterclaim

R&B's request for summary judgment on its counterclaim against Polycon for breach of contract hinges upon its request for summary judgment that the machines "successfully operated" by May 11, 2017. [*See* DE 175 at 24–25.] Accordingly, given my denial of R&B's request for summary judgment on "successful operation", this request is also denied. Analysis of R&B's breach of contract claim will have to follow the jury determination of the "successful operation" question.

## III.    R&B's Motion in Limine Concerning Polycon's Damages Expert Gerald Lynch

16

As discussed during the August 1, 2024, omnibus hearing on the five then-pending motions in this case, including the present Motion for Partial Summary Judgment [DE 174] and R&B's Motion in Limine concerning Polycon's Damages Expert Gerald Lynch [DE 168], I floated the idea of a bifurcated civil jury trial. In my conception of things, the bifurcated trial would proceed as follows: First, a jury would determine the question of the Parties' liability, which would determine the Parties understanding of "successful operation" and whether "successful operation" ever occurred. After doing so, a second jury would at a later date begin a trial limited to the question of damages. Consistent with the Seventh Amendment, this damages trial would be limited to the relevant time period as determined in the liability portion of the trial.

Accordingly, the Parties are ORDERED to submit briefing by **September 19, 2024**, as to their position on a bifurcated trial, including their desired logistics of the same, and be prepared to discuss the issue during a telephonic status hearing for this case that I hereby schedule for **September 24, 2024, at 1:00 pm CST**. To connect to the Zoom teleconference the parties should dial 833-568-8864, enter meeting ID number 161 4768 5938#, push # to skip entry of a participant ID, and enter passcode 220198# at least five minutes before the conference start time.

Given this pending discussion of a separate, damages-focused portion of a bifurcated trial, I hereby **DENY WITHOUT PREJUDICE** R&B's Motion in Limine

concerning Lynch [DE 168]. R&B is given leave to refile this Motion, should it need to, prior to a damages portion of the bifurcated trial.

For these reasons, the Court:

(1) DENIES R&B's Motion for Partial Summary Judgment [DE 174];

(2) DENIES WITHOUT PREJUDICE R&B's Motion in Limine to Exclude the Testimony of Plaintiff's Damages Expert, Gerald Lynch [DE 168]; and

(3) SETS a telephonic status conference for September 24, 2024 at 1:00 pm CST.

SO ORDERED on September 5, 2024.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT