# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| POLYCON INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff & Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-CV-485-PPS |
| | ) | |
| R&B PLASTICS MACHINERY, LLC, | ) | |
| and MONROE MOLD, LLC, | ) | |
| | ) | |
| Defendants & Counterclaimants. | ) | |

## OPINION AND ORDER

This lawsuit involves three players in the plastic bottle manufacturing process. Plaintiff, Polycon Industries, manufactures "blow molded" plastic bottles and containers. R&B Plastics Machinery designs and manufactures the machines that can be used to make blow molded containers. And Monroe Mold designs and builds the molds used in the container making process. The present litigation arises from Polycon's purchase of two new blow molding machines from R&B and molds for those machines from Monroe Mold. At bottom, Polycon claims that neither R&B nor Monroe have fulfilled the representations in the applicable contracts and warranties.

Polycon's First Amended Complaint contains a series of warranty and contract related claims against R&B. Polycon's remaining claims against R&B are not presently before the court. Instead, this opinion will focus on Polycon's breach of warranty and breach of contract claims against Monroe and Monroe's related counterclaim against Polycon based on Polycon's failure to pay the remaining balance on an invoice for one

1

of the molds. Monroe now seeks summary judgment on Polycon's claims and its counterclaim. [DE 180.] For the reasons I discuss below, I will GRANT in part and DENY in part Monroe's request for summary judgment.

## Summary Judgment Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted).

## Undisputed Facts

Monroe is a "sister company" of R&B that builds molds for the blow molding machines that R&B makes and sells. [DE 213 at ¶¶33–34.] As Polycon began its discussions with R&B to purchase two blow molding machines (the "4/11 machine" and the "8/16 machine"), R&B advertised the services of Monroe to build the molds necessary for both machines. [*Id.* at ¶¶33, 35.] Monroe had no contact with Polycon prior to Polycon completing its contract with R&B to purchase the two machines, but

Monroe was aware that R&B was proposing to build blow molding machines for Polycon. [*Id*. at ¶38.]

After Polycon contracted to purchase the machines, Polycon contacted Monroe to build an initial set of four molds. Monroe was to build three sets of molds for the 8/16 machine: (1) a 2.5-gallon Ecolab bottle; (2) a 2.5-gallon "Top Handle" bottle; and (3) a 2.5-gallon "No Glug" bottle. [*Id*. at ¶39.] Monroe was to also build one mold for the 4/11 machine: (4) a 93-oz Ecolab capsule. [*Id*. at ¶40.] Of the three requested molds for the 8/16 machine, R&B assigned top priority to the 2.5-gallon Ecolab bottle mold. [*Id*. at ¶41.]

On April 13, 2016, Polycon emailed bottle specification sheets for the 2.5-gallon Ecolab bottle and the 93-oz Ecolab capsule to David Corson, the Sales Director for both Monroe and R&B. [*Id*. at ¶¶42–43; DE 199-3 at 1–2, 15–16.] Corson forwarded these materials to Monroe's President, Jim Ghesquire, later that same day. [DE 213 at ¶¶42–43.] These written specifications for the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule included dimensions, various technical drawings, and descriptions of the materials that were to be used to manufacture the bottles and capsules. [*Id*. at ¶48; DE 199-3 at 3–14, 17–24.]

Polycon also provided Monroe with samples of the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule that the molds designed and manufactured by Monroe were to be capable of producing. [DE 213 at ¶45.] Monroe also does not dispute that Polycon provided Monroe with the opportunity to inspect an existing set of molds for the 93-oz

3

Ecolab capsule that Polycon had been using on an older blow molding machine. [*Id*. at ¶46.]

On May 4, 2016, Polycon similarly emailed bottle specifications for the 2.5-gallon Top Handle and No Glug bottles to David Corson of R&B. [DE 199-4 at 2.] Corson forwarded this information to Gesquire of Monroe later that same day with a note that "[b]oth bottles have molds that are available for the reverse engineering of the cavity." [*Id*. at 1.] Monroe does not dispute that Polycon provided Monroe with sample bottles of the Top Handle and the No Glug bottles or that Polycon provided Monroe the opportunity to inspect and "reverse engineer" molds then in use on Polycon's existing machine that had not been supplied by R&B. [DE 213 at ¶49.]

Monroe used the information and samples provided by Polycon to draft article drawings for the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule molds. [*Id*. at ¶54.] Monroe sent these drawings to Ecolab and communicated with Ecolab concerning requested revisions to the article drawings. [*Id*. at ¶¶55–56.] Ecolab approved the article drawings for the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule molds on July 25, 2016. [*Id*. at ¶57.] Monroe disputes that this July 25, 2016, approval represented the "ultimate approval" by Ecolab and claims that additional changes, requiring further approval by Ecolab, were made to the drawings well into December 2016. [*Id*. at ¶58.]

After the exchange of the drawings, specifications, and dimensions between Monroe and Polycon, the Parties exchanged numerous proposals and purchase orders for the four sets of molds from May through September 2016. [*Id*. at ¶53; DE 39-8

through DE 39-17.] The proposals and purchase orders did not include specific delivery dates for the molds. [DE 200 at ¶6.] Instead, the proposals and purchase orders state that the molds were to be delivered either at the same time as R&B's machines or that delivery would be "established at time of release." [*Id*.] Polycon disputes that these proposals and purchase orders constitute the complete description of the Parties' contract and alleges that the specifications exchanged prior to these purchase orders and proposals also were a part of the Parties' agreement. [*Id*. at ¶2.]

Problems began almost immediately after Monroe delivered the initial set of four molds to Polycon. On January 16, 2017, Polycon personnel noted (internally at first, it appears) that the label panel on the 93-oz Ecolab capsules that were produced using Monroe's molds on one production line for the 4/11 machines were in a different location than the 93-oz Ecolab capsules that were produced on a different production line by Polycon's older blow molding machine that did not use Monroe molds. [DE 213 at ¶64.] As a result, Polycon could not use the same automatic label printer for all the 93-oz Ecolab capsules that it produced. Polycon notified R&B and Monroe of the 93-oz Ecolab capsule label panel issue on January 18, 2017. [*Id*. at ¶63; DE 199-9; DE 199-10.]

Monroe denied that their molds were to blame for the label panel issue and refused to "revise" their molds for the 93-oz capsule. [*Id*. at ¶67.] As a result, Polycon opted to replace the four non-Monroe molds for 93-oz Ecolab capsules (then used by the older blow molding machine) with new Monroe-provided molds. [*Id*. at ¶¶69–70.] This

way, Polycon thought, all 93-oz capsules produced on its machines would have the same label panel location.

By February 19, 2018, Polycon notified Monroe of issues with holes and thin spots on the bottom of 2.5-gallon Ecolab bottles produced using Monroe's molds. [*Id.* at ¶¶73–74.] Later in February 2018, Polycon notified Monroe of an "orange peel" issue (meaning that the surface of the bottle was too rough) with the 2.5-gallon Ecolab bottle molds. [*Id.* at ¶¶73, 76.] Polycon also alleges additional "defects" with the 2.5-gallon Ecolab bottle molds, including issues with the compression eye, venting issues, and "defective tops with blow pin and takeout pins that did not match." [*Id.* at ¶73.]

Regarding the 2.5-gallon Top Handle and the 2.5-gallon No Glug molds, Polycon alleges that the molds produced bottles with corners that were too sharp (which caused holes), a thin spot in the tail, a larger hanger tag was required, the dome needed to be enlarged, and there was an issue with the bottle neck dimensions. [*Id.* at ¶¶81–90.] Polycon asserts that it raised all of these concerns with Monroe. [*Id.*]

Except for the non-matching blow pin and takeout location issue, which Polycon acknowledges that Monroe fixed, Polycon alleges that Monroe did some "rework" on its molds but that the problems with the molds persisted. [*Id.* at ¶94.] Monroe disputes this characterization. [*Id.*] Polycon paid the full agreed upon purchase price for the 93-oz Ecolab capsule molds, the 2.5-gallon Ecolab bottle molds, and the 2.5-gallon Top Handle molds. [*Id.* at ¶99.] Polycon made a 50% downpayment of $116,500 on the remaining Monroe molds (the 2.5-gallon No Glug molds) but has not paid the

6

remaining 50% of the purchase price. [*Id*. at ¶100.] Monroe does not dispute that Polycon has already paid Monroe an additional at least $50,000 above the original purchase price to get the 2.5-gallon Top Handle molds to work. [*Id*. at ¶117.] Polycon alleges that the No Glug molds, even after extensive rework by Monroe, have never produced commercially acceptable bottles. [*Id*. at ¶¶118–19.]

## Discussion

### I.    Polycon's Breach of Contract Claim

Polycon claims four ways in which Monroe breached its contract: (1) delayed delivery of the molds; (2) provided "non-conforming molds"; (3) failed to provide copies of its engineering drawings of the molds; and (4) the molds were defective because they produced bottles that "did not meet [s]pecifications" and had other problems such as thin spots and holes, inadequate thickness, "orange peel", and uneven surfaces. [DE 200 at ¶4 (quoting DE 39 at ¶¶97–98).]

In its Motion for Summary Judgment, Monroe argues that the proposals and purchase orders for the molds, with one exception, did not include any of the terms that Polycon alleges Monroe breached. [DE 181 at 11.][1] The one exception is that Monroe admits that its contract with Polycon required Monroe to provide copies of its engineering drawings to Polycon, but Monroe says it met that term. [*Id*. at 5, 11] Monroe argues that the proposals and purchase orders that formed the basis of its contract with

---

[1] DE 181 does not contain docket stamped page numbers at the top of the document. Therefore, citations to this document refer to the page number Monroe uses at the bottom of each page.

Polycon included only "bare-bones descriptions" of the molds. According to Monroe, Polycon cannot point to any evidence of other promises, oral or written, besides the purchase orders and proposals that formed the basis of the Parties' agreement. In Monroe's view, the conditions that form Polycon's breach of contract and warranty claims (with the one exception for providing copies of the engineering drawings) simply were not a part of the Parties' agreement and therefore could not have been breached. It follows, Monroe argues, that Polycon's breach of contract claims fail as a matter of law.

Polycon counters that genuine issues of material fact exist as to the basis of the Parties' agreement. Polycon argues that "in order to make molds for the 4 bottles named in the [purchase orders and proposals] there had to be an understanding of the specifications of the bottles the molds had to be capable of producing." [DE 199 at 12.] According to Polycon, to find otherwise would lead to the nonsensical conclusion that Monroe could have supplied "molds which produced bottle of any shape or size" so long as they "named them according to the bottle title on the proposal and purchase order." [*Id.*]

To overcome the apparent lack of detail in the purchase orders and proposals, Polycon points to Section 2-202 of the U.C.C., as incorporated by Ind. Code § 26-1-2-202, to argue that the bottle specifications and sample bottles can be used to "explain[ ] and supplement[ ] the proposals and purchase orders by defining" the Parties' understanding of the four different bottles. [*Id.* at 13.] To do this, Polycon principally

8

argues that the Parties' "course of dealing" and "usage of trade" support the notion that the molds were to be able to produce the four bottle types according to specifications and sample bottles previously provided to Monroe. [*Id*. at 13–16.]

Before I analyze each of Polycon's four alleged breaches of contract, let's start with some basics about Indiana contract law. Under Indiana law, as elsewhere, the "essential elements of any breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages." *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. Ct. App. 2015) (quoting *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998)). The goal of contract interpretation under Indiana law "is to determine the parties' intent when they made the agreement." *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014). "In the case of a written contract, the parties' intent is determined by looking first to the plain and ordinary meaning of the contract language." *BKCAP, LLC v. CAPTEC Franchise Trust 2000–1*, 572 F.3d 353, 359 (7th Cir. 2009) (citing *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997)). If that contract language is "clear and unambiguous, the document is interpreted as a matter of law without looking to extrinsic evidence." *Id*. "A contract may be construed on summary judgment if it 'is not ambiguous or uncertain,' or if 'the contract ambiguity, if one exists, can be resolved without the aid of a factual determination.'" *In re Indiana State Fair Litig.*, 49 N.E.3d 545, 548 (Ind. 2016) (quoting *Warrick County ex rel. Conner v. Hill*, 973 N.E.2d 1138, 1144 (Ind. Ct. App. 2012), *trans. denied*.).

On the flip side, if a court determines that the contract language is ambiguous, the contract's meaning becomes a question for the trier of fact. *Kessel v. State Auto. Mut. Ins. Co.*, 871 N.E.2d 335, 337 (Ind. Ct. App. 2007). "A contract is not ambiguous merely because the parties disagree as to its proper construction." *Vincennes Univ. by the Bd. of Trs. of Vincennes v. Sparks*, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2013). Instead, contract language is ambiguous only if reasonable persons would differ as to the meaning of its terms or find it susceptible to more than one construction. *Id.* If the contract language is ambiguous, then "an examination of relevant extrinsic evidence is appropriate in order to ascertain the parties' intent." *BKCAP, LLC*, 572 F.3d at 359.

The meaning of a contract is ascertained from considering all its provisions, not from just looking at individual words, phrases, or paragraphs alone. *Evansville-Vanderburgh Sch. Corp. v. Moll*, 344 N.E.2d 831, 837 (Ind. 1976). Accordingly, if it is reasonable, I must accept a construction of a contract that harmonizes all its provisions (rather than a construction that causes the provisions to conflict). *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 501 (Ind. Ct. App. 2007). I must "make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Allen v. Cedar Real Estate Grp., LLP*, 236 N.E.2d 374, 380 (7th Cir. 2001) (citation omitted) (applying Indiana law).

The Parties do not dispute that the exchange of Monroe's proposals and Polycon's purchase orders formed a contract for Monroe to sell Polycon four sets of molds, though Polycon disputes that these documents contain all applicable

descriptions of the molds. [DE 200 at ¶2.] Given the Parties and my own agreement on formation, my next step is to determine the Parties' intent, which I will do by first looking to the language of the purchase orders and proposals that the Parties agree form their contract.

To recap, Polycon engaged Monroe to build four sets of molds capable of producing: (1) a 2.5-gallon Ecolab bottle; (2) a 2.5-gallon "Top Handle" bottle; (3) a 2.5-gallon "No Glug" bottle; and (4) a 93-oz Ecolab capsule. [DE 213 at ¶¶39–40.] To effectuate these purchases, Polycon and Monroe exchanged the following proposals and purchase orders:

- 2.5-gallon Ecolab bottle: (1) Purchase Order #50399, dated May 12, 2016, and (2) Proposal #16031702B, dated May 16, 2016. [DE 39-10; DE 39-11.]

- 2.5-gallon "Top Handle" bottle: (1) Proposal #16031703A, dated July 25, 2016, and (2) Purchase Order #50419, dated August 3, 2016. [DE 39-12; DE 39-13.]

- 2.5-gallon "No Glug" bottle: (1) Proposal #16050501A, dated July 25, 2016, and (2) Purchase Order #50420, dated August 3, 2016. [DE 39-14; DE 39-15.]

- 93-oz Ecolab capsule: (1) Purchase Order #50397, dated May 10, 2016, and (2) Proposal #15121801B, dated May 16, 2016. [DE 39-8; DE 39-9.] As well as (3) Proposal #15121801D, dated July 25, 2016, and (4) Purchase Order #50449, dated September 20, 2016. [DE 39-16; 39-17.]

Polycon does not dispute that the purchase orders and proposals include the quantity, price, and general descriptions of the molds, though (as mentioned) Polycon

disputes that these documents constitute all applicable descriptions of the molds. [DE 200 at ¶3.] Nor does Polycon dispute that the purchase orders and proposals do not include specific, agreed upon delivery dates for the molds. [*Id.* at ¶6.]

My review of the purchase orders and proposals confirms these undisputed facts. First, with respect to the 93-oz Ecolab capsule, both the May 10 and September 20, 2016, purchase orders note under a category for "What Line" that the molds were for "Ecolab 93 oz" or "93oz Ecolab", respectively. [DE 39-8; DE 39-17.] The May 2016 purchase order includes a limited description of what appears to be the materials or processes used for components of the 93-oz capsule mold as well as costs for time spent "[r]everse engineer[ing] 3D File Customer supplied PDF and Sample Bottles." [DE 39-8.] The September purchase order includes additional costs for "Reverse Engineer 3D File" and "Design Revs" in accordance with referenced article drawing revisions. [DE 39-17.] The May and July 2016 proposals include similar descriptions and ship dates of "With Machine" and "With Molds", respectively. [DE 39-9; DE 39-16.]

The purchase orders and proposals for the remaining three molds follow this same format and include similar descriptions and content. There are a few nuances worth mentioning. For example, the 2.5-gallon "No Glug" purchase order and proposal both include "Generate a 3D Bottle File and Article Drawing." [DE 39-14; DE 39-15 at 1.] The purchase order and proposal for the mold to make the 2.5-gallon Top Handle bottle include this same item, [DE 39-12; DE 39-13 at 1.], while the 2.5-gallon Ecolab bottle

mold purchase order and proposal include the "Reverse Engineer 3D File" item present in the 93-oz capsule documents. [DE 39-10; DE 39-11.]

It is obvious that the language of the purchase orders and proposals did not include detailed specifications or drawings of the bottles the molds were to be capable of producing. They do, however, reference Monroe's creation and revision of article drawings or reverse engineering of sample bottles and specifications provided by Polycon. They also reference specific bottle designs, and the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule documents mention Ecolab. It is difficult for me to interpret based on these documents alone whether the Parties intended for the molds to produce exact duplicates of the specifications and sample bottles that Polycon provided to Monroe (as Polycon claims) or some new, otherwise acceptable version of the bottles that Polycon could sell to customers (as Monroe claims). But what is clear is that the Parties were referring to specific bottle types and in the case of the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsules a specific customer—i.e. Ecolab—that Polycon intended to sell those bottles to.

Both Parties argue that the "reverse engineer" language supports their relative positions, but there are multiple plausible interpretations of this language. Most persuasive to me is the fact that Polycon does not dispute that it used the Monroe molds to manufacture bottles that Ecolab approved, or "qualified", though Polycon claims that other issues persisted with the bottles produced by these two molds. [DE 200 at ¶¶23–24.] Nevertheless, it is clear that Polycon went on to sell millions of bottles to Ecolab

using these molds, even if the precise number of bottles is disputed. After all, for the Ecolab molds, that is all that Polycon cared about—making bottles it could sell to Ecolab. Moreover, to show the Parties' intent—the intent being to produce molds that could make bottles to Ecolab's satisfaction—Monroe has produced evidence that it engaged in a back and forth with Ecolab concerning a set of article drawings that Monroe created for the 93-oz capsule and 2.5-gallon Ecolab bottle molds that Ecolab initially approved on July 25, 2016. [DE 213 at ¶57.] In short, at least with respect to the 93-oz Ecolab capsule and 2.5-gallon Ecolab bottle molds, it seems that Polycon got exactly what the bare-bones contractual language suggests: molds capable of producing capsules and bottles that Polycon could sell to Ecolab.

So, what does all this mean? May I consider additional evidence of the specifications Polycon and Monroe exchanged before the purchase orders and proposals to elaborate on these references to "Reverse Engineer" and "Sample Bottles"? If so, in what way? To answer these questions, let's return to Indiana contract law.

Monroe cites *Uniroyal, Inc. v. Chambers Gasket & Manufacturing Co.* for the proposition that "[t]he terms of the contract are those on which the writings agree, as supplemented by applicable Code provisions." 380 N.E.2d 571, 578 (Ind. Ct. App. 1978). Monroe ignores the context of this statement in *Uniroyal*, which concerns the common law "mirror image rule" as modified by the U.C.C.[2] The *Uniroyal* court relied upon

---

[2] Indiana has adopted sections of the U.C.C. into its own commercial code. Ind. Code §§ 26–1–1–101, *et seq*. Indiana and federal case law interpreting Indiana law often use the U.C.C. and Indiana's version of the U.C.C. interchangeably.

Section 2-207 of Indiana's U.C.C. to conclude that even though one party's acceptance was "expressly conditioned on [the other party's] assent to the new terms and the record reveals no manifestation of [the other party's] assent to those terms", the parties performed what they believed to be their contractual obligations, so their conduct was sufficient to establish a contract. *Id*. Section 2-207 provides that in circumstances where conduct creates a contract, the terms of that contract "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." Ind. Code § 2-207(3). I don't view this as a situation of "Additional Terms in Acceptance or Confirmation", which is covered by Section 2-207. Here, the Parties don't present evidence or allege that Polycon's acceptance of the proposals and submission of the purchase orders to Monroe included an *additional* or *different* term.

Polycon does a better job getting to the core of this issue by framing the question as whether the specifications and sample bottles were a basis of the Parties' agreement necessary to the "meeting of the minds" that formed their contract. Polycon seeks to classify these specifications as admissible parol evidence that is consistent with and explains the terms of the purchase orders and proposals. Polycon points to Section 2-202 of Indiana's U.C.C., which provides that "final written expressions of agreement cannot be contradicted by evidence of prior agreement or a contemporaneous oral agreement but may only be explained or supplemented." *Cont'l Grain Co. v. Followell*, 475 N.E.2d 318, 321 (Ind. Ct. App. 1985). The purpose of Section 2-202 is "to explain or supplement

the terms of any writing stating the agreement of the parties in order that true

understanding of the parties as to the agreement may be reached." Ind. Code § 26-1-2-

202, cmt. 2.

> Here's what Section 2-202 says:

> Sec. 202. Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a record intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

> (a) by course of dealing or usage of trade (IC 26-1-1-205) or by course of performance (IC 26-1-1-205); and

> (b) by evidence of consistent additional terms, unless the court finds the record to have been intended also as a complete and exclusive statement of the terms of the agreement.

Ind. Code § 26-1-2-202.

Pursuant to Section 1-205, the express terms of an agreement, course of dealing,

course of performance, and usage of trade "shall be construed wherever reasonable as

consistent with each other." Ind. Code § 26-1-1-205(5). If such a construction is

unreasonable, then Section 1-205 dictates an order of prioritization that assigns weight

to these sources in the following order: (1) express terms; (2) course of performance; (3)

course of dealing; and finally, (4) usage of trade. *Id*. This point is amplified by Comment

Two of Section 2-202, which states that "the course of actual performance by the parties

is considered the best indication of what they intended the writing to mean." Ind. Code

§ 26-1-2-202, cmt. 2.

16

Before diving into Polycon's argument regarding Section 2-202, it's worth pointing out that parol evidence may be consulted:

> [N]ot only in cases of ambiguity in a writing, but in all cases, unless the evidence to be presented contradicted the terms of the writing. In other words, the test for allowing the use of such evidence does not rest on whether the terms are clearly written into the contract, but whether the evidence is contradictory to those expressed terms.

*Luedtke Eng'g Co. v. Indiana Limestone Co., Inc.*, 592 F.Supp.75, 82 (S.D. Ind. 1983), *aff'd*, 740 F.2d 598 (7th Cir. 1984). Importantly, "[a]lthough an established course of dealing or course of performance may 'give particular meaning to and supplement or qualify terms of an agreement,' it does not constitute the agreement." *KR Enters., Inc. v. Zerteck, Inc.*, 461 F.Supp.3d 825, 836 (N.D. Ind. 2020) (citing Ind. Code § 26-1-1-205(4)). I must keep in mind that if "an ambiguity arises solely because of contractual language and not because of extrinsic facts, interpretation of the contractual language is a question of law for the court to decide", but if "the ambiguity requires extrinsic evidence to be determined, its construction is a question to be resolved by the trier of fact." *Wildwood Indus., Inc. v. Genuine Mach. Design, Inc.*, No. 4:06–CV–00124–PRC, 2007 WL 3046435, at *11 (N.D. Ind. Oct. 15, 2007).

Polycon focuses its parol evidence argument on "course of dealing" and "usage of trade" under Section 2-202(a). Indiana defines course of dealing and usage of trade as separate terms and separate bases for the introduction of parol evidence. Starting with "course of dealing", Indiana defines that phrase as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as

establishing a common basis of understanding for interpreting their expressions and other conduct." Ind. Code § 26-1-1-205(1). This course of dealing "give[s] particular meaning to and supplement or qualify terms of an agreement." *Id*. at § 26-1-1-205(4).

Polycon argues that the exchange of drawings, other specifications, sample bottles, and the opportunity to "reverse engineer" prior to exchange of the proposals and purchase orders for the molds were a "course of dealing" that demonstrated an understanding that the molds would produce bottles that matched the samples and drawings. Monroe counters that Polycon has established no evidence of transactions between Polycon and Monroe before the sale of mold at issue here, so Polycon therefore cannot prove a prior "course of dealing." Monroe is correct that this course of dealing argument is a dead end for Polycon.

The comments to Section 1-205, consistent with the plain language of the text, are clear that "[c]ourse of dealing under subsection (1) is restricted, literally, to a sequence of conduct between the parties *previous to the agreement*." *Id*. at cmt. 2 (emphasis added). To Polycon, the Parties exchange of drawings, specifications, and sample bottles was the "sequence of previous conduct", while Monroe argues that those exchanges were all part of the same, inaugural transaction. Monroe's argument carries the day.

Indeed, Polycon's argument is at war with itself. Polycon cannot argue that the Parties exchange of specifications prior to the proposals and purchase orders was evidence of some prior transaction while also arguing that it was an essential part of the transaction at issue here. The exchange of the specifications was part of the same

transaction as the exchange of the purchase orders and proposals and represented the Parties' first interaction with each other. Case law supports that a "sequence" of previous conduct requires more than one transaction. *See Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1381 (7th Cir. 1990) (applying Wisconsin's same version of Section 2-202 and rejecting a course of dealing argument "since the parties are dealing for their first time."). Course of dealing is plainly inapplicable to Monroe and Polycon's transaction.

Next, Polycon asserts that it is common "usage of trade" to understand that the molds Monroe provided were to be able to produce the bottles described in the specifications. [DE 199 at 15.] This argument is also weak. In Indiana, a usage of trade is "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." Ind. Code. § 26-1-1-205(3). Unaddressed by Polycon is that the "existence and scope of such a usage are to be proved as facts." *Id*. Moreover, "[e]vidence of a relevant usage of trade offered by one party is not admissible unless and until the party has given the other party such notice as the court finds sufficient to prevent unfair surprise to the latter." *Id*. at § 26-1-1-205(7).

To support its argument that it is a "usage of trade" to make molds that match specifications and sample bottles provided by the purchasing customer, Polycon makes brief, out of context, and uncited references to the deposition testimony of two Monroe witnesses. But Polycon has presented no serious evidence concerning a practice having

"such regularity of observance" in the mold making industry to justify a finding regarding usage of trade. I have reviewed the discussions in Mr. Ghesquire's testimony [*see* DE 199-2 at 24–25] and Mr. Schwemmin's testimony [*see* DE 199-5 at 4] and find no substantive discussion of trade usage in the mold making industry. While "[t]he testimony of one individual has been found sufficient to establish a usage of trade", it is a bridge too far to analogize stray comments in a deposition to trial evidence specific to the question of usage of trade in *Todd Heller, Inc. v. Indiana Dep't of Transp.*, 819 N.E.2d 140, 148 (Ind. Ct. App. 2004) as Polycon attempts to do.

With Polycon's efforts to use Section 2-202(a) out of the way, let's move on to consider whether 2-202(b) provides some insight on the Parties' intent. Recall that 2-202(b) says that an agreement may be "explained" or "supplemented" by evidence of "consistent additional terms, unless the court finds the record to have been intended also as a complete and exclusive statement of the terms of the agreement." Ind. Code § 26-1-2-202(b). At least with respect to the two Ecolab molds (the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule), I find that the straightforward operation of Section 2-202(b) simplifies the issues here considerably. First, "[a] threshold requirement for the application of Section [2-]202 is a finding that the agreement at issue is a final written expression of the parties' agreement." *Mid-Am. Salt, LLC v. Bob & Dave's Lawn & Landscape Maint., Inc.*, No. 1:16-CV-285-HAB, 2019 WL 4415532, at *4 (N.D. Ind. Sept. 16, 2019) (citing *Front v. Lane*, 443 N.E.2d 95, 97 (Ind. Ct. App. 1982)). "The determination of

whether the parties intended a writing to be totally integrated must be based on all the relevant evidence." *Id.* (citing *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986)).

I can find nothing in the purchase orders and proposals that indicates that the Parties intended these documents to be a complete and exclusive statement of the terms of their agreement. For example, none of the purchase orders or proposals include an integration clause or language to that effect. These contract documents are indeed, by Monroe's own admission, "bare bones." Having found no evidence that the Parties intended the purchase orders and proposals to be the complete and exclusive expression of their agreement, I may use Section 2-202(b) to supplement the Parties' understanding of their contract if there is evidence of consistent additional terms of the Parties' agreement.

The Parties' exchange of emails and specifications on April 13, 2016, for the Ecolab molds [*see* DE 199-3] and on May 4 through 5, 2016, for the 2.5-gallon Top Handle and No Glug molds [*see* DE 199-4] are evidence of consistent, additional terms that provide valuable context for the Parties' understanding of the products described in the "What Line" or "Description" sections of the purchase orders and proposals. To find otherwise would mean that Monroe had no idea what product its molds were to produce, which is an absurd result. My review of this additional evidence demonstrates that the Parties had a clear intention for the use and production of the Ecolab molds, but the Parties' intentions concerning the 2.5-gallon No Glug and Top Handle molds remains murky.

21

For the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule, the record supports an understanding that the Parties contracted for Monroe to produce molds that could create commercially acceptable products that Polycon could sell to Ecolab. Polycon informed Monroe that it wished to produce and sell specific products to Ecolab using Monroe's molds. Ecolab supplied the initial specifications that Monroe used to create detailed article drawings for these two products. [*See* DE 199-3.] During the course of its performance, Monroe worked with Ecolab and achieved their approval of the article drawings and then provided molds based on these article drawings that Polycon used to produce 2.5-gallon bottles and 93-oz capsules that Ecolab qualified and purchased (though, as noted above, Polycon claims that other issues persisted for these two molds). [DE 199-6; DE 200 at ¶¶23–24.] This additional evidence supports the conclusion that the Parties intended the sample bottles and specifications for these molds to serve as the beginning point for the design of molds that could produce products that Polycon could sell to Ecolab. And that's exactly what happened here.

But it's a different story for the No Glug and Top Handle molds. Unlike the Ecolab molds, a review of the additional evidence of the Parties' email communications and exchanged specifications and sample bottles reveals unanswered questions of fact as to the Parties' intentions for these molds. First, there is no evidence that Polycon requested the molds to create bottles for a specific customer. In addition, Monroe has pointed to no evidence that it worked with any customers to produce article drawings

that were approved by that customer. Finally, the Parties dispute whether the molds Monroe supplied for these two bottles ever created commercially marketable bottles.

Given the undisputed factual record to support the conclusion that the molds Monroe supplied for the Ecolab products fulfilled their contractual obligations, I will grant summary judgment to Monroe on Polycon's breach of contract claims concerning providing "non-conforming molds" or molds that "did not meet specifications" for the Ecolab molds. However, questions of fact remain concerning these claims for the 2.5-gallon No Glug and Top Handle bottles, so I will deny summary judgment on Polycon's breach of contract claims for these two bottles.

There are a few more issues to address concerning Polycon's breach of contract claims. Neither Parties' briefing spends much time on Polycon's breach of contract claims concerning delayed delivery date of the molds. Perplexingly, Polycon does not dispute that the purchase orders and proposals that formed its contract with Monroe did not include any specific, agreed upon delivery dates. [DE 200 at ¶6.] Polycon disputes Monroe's claim that any expected delay in delivery of Monroe's molds was caused by Ecolab's delay in approving the article drawings for the Ecolab molds, [*see id.* ¶7], but any factual dispute here is largely irrelevant given Polycon's admission that the contract did not include specific delivery dates for the molds. Polycon's bare assertion in its Amended Complaint that "Monroe delayed in the delivery of the molds" is left unsupported by anything Polycon has put forth in the factual record on summary

judgment. Accordingly, I grant Monroe's request for summary judgment on the "delayed delivery" breach of contract claim for all four molds.

Likewise, neither Party spent considerable time arguing Monroe's request for summary judgment on Polycon's breach of contract claim concerning Monroe's failure to provide copies of the engineering drawings for the molds. Monroe does not dispute that providing copies of the engineering drawings was included in the Parties' contract. [DE 181 at 2.] But Polycon does not dispute Monroe's claim that Monroe provided copies of the engineering drawings for the molds "in the shipping crates with [the] molds when delivered." [DE 200 at ¶10.] Polycon disputes the characterization of a witness's testimony concerning receipt of the engineering drawings, but Polycon does not appear to dispute that it in fact received the engineering drawings with the shipment of molds. [*See id*. at ¶11.] As with the delayed delivery claim, I find no genuine issues of material fact exist and grant Monroe summary judgment on Polycon's breach of contract claim concerning delivery of the engineering drawings for all four molds.

## II.    Polycon's Implied Warranty Claims

Monroe next seeks summary judgment on Polycon's two breach of implied warranty claims. Polycon claims that Monroe breached an implied warranty of merchantability and an implied warranty of fitness for a particular purpose. As I will discuss below, some of the Parties' arguments concerning Polycon's warranty claims are specific to Polycon's separate warranty claims. But other arguments are applicable

to both warranties. In the discussion that follows, I will first analyze Monroe's arguments specific to the implied warranty of merchantability, next discuss Monroe's arguments and Polycon's responses specific to the implied warranty of fitness for a particular purpose, and finally discuss any claims or defenses by Polycon that are applicable to both warranties.

Monroe argues that, as with express warranty claims, a plaintiff with implied warranty claims must first provide the seller/warrantor with notice of the alleged defects and a reasonable opportunity to cure those alleged defects. [DE 181 at 14–15.] Monroe claims that Polycon failed to provide both notice and an opportunity for Monroe to repair the alleged defects. [*Id.*] Next, Monroe argues that Polycon's purchase of additional 93-oz capsule molds and use of the 93-oz Ecolab capsule and 2.5-gallon Ecolab molds to produce tens of millions of "qualified" capsules and bottles that Polycon sold to Ecolab demonstrates that the molds were "fit" for their particular purpose: to produce bottles that Polycon could sell to Ecolab. Finally, Monroe argues that the implied warranties do not require Monroe's molds to produce bottles at specific output rates or to achieve any particular "production capacities." [*Id.* at 16.]

Polycon sees things differently. Specific to the implied warranty of merchantability, Polycon argues that genuine issues of material fact exist as to whether the molds satisfied the contract description or were fit for their ordinary purpose. Specifically, Polycon states that the "particular purpose" of the molds was to "make specific bottles that met specific requirements communicated in drawings, dimensions

and through samples." [DE 199 at 17.] Polycon claims that the Parties' disagreement on

this point is again a genuine issue of material fact. Finally, relevant to both its warranty

claims, Polycon claims yet another genuine issue of material fact exists as to whether

Polycon provided notice to Monroe of the alleged defects. [*Id*. at 18–19.]

I will first consider Monroe's argument concerning the implied warranty of

merchantability. Indiana's implied warranty of merchantability, based on the U.C.C.

version of the same, states:

> (1) Unless excluded or modified (IC 26-1-2-316), a warranty that the goods
> shall be merchantable is implied in a contract for their sale if the seller is a
> merchant with respect to goods of that kind. Under this section the serving
> for value of food or drink to be consumed either on the premises or
> elsewhere is a sale.
> (2) Goods to be merchantable must at least be such as:
>> (a) pass without objection in the trade under the contract description;
>> and
>> (b) in the case of fungible goods, are of fair, average quality within
>> the description; and
>> (c) are fit for the ordinary purposes for which such goods are used;
>> and
>> (d) run, within the variations permitted by the agreement, of even
>> kind, quality, and quantity within each unit and among all units
>> involved; and
>> (e) are adequately contained, packaged, and labeled as the
>> agreement may require; and
>> (f) conform to the promises or affirmations of fact made on the
>> container or label if any.
> (3) Unless excluded or modified (IC 26-1-2-316), other implied warranties
> may arise from course of dealing or usage of trade.

Ind. Code § 26-1-2-314.

To apply to a transaction, the implied warranty of merchantability requires that

the seller be a "merchant with respect to goods of that kind." *Id*. at § 26-1-2-314(1).

Indiana defines a merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ." Ind. Code § 26-1-2-104(1). Monroe does not dispute, nor could it, that it is a merchant of blow-molding molds. Producing these molds is the core of Monroe's business. Next, I must examine whether there is any evidence that the Parties excluded or modified the implied warranty of merchantability. Again, Monroe does not argue that it excluded or modified this implied warranty, and I could find no evidence of the Parties having done so in the bare-bones language of the proposals and purchase orders for the molds. Given this, I find that the implied warranty of merchantability attached to this transaction.

The Parties' briefing on merchantability, as with fitness for a particular purpose, which I will discuss below, largely talks past each other and focuses on separate issues. Monroe focuses on Polycon's purported substantial use of the molds to produce acceptable bottles and on the notice/opportunity to fix issue. Polycon responds to Monroe's notice and opportunity to fix argument but largely ignores Monroe's argument concerning "substantial use." Polycon instead relies upon its expert witness testimony to challenge whether the molds could "pass without objection in the trade under the contract description" or were fit for their ordinary purposes.

Merchantability requires that goods "conform to ordinary standards of care and that they are of average grade, quality, and value of similar goods sold under similar conditions." *Woodruff v. Clark Cnty. Farm Bureau Coop. Ass'n, Inc.*, 286 N.E.2d 188, 194

(Ind. Ct. App. 1972). Given this definition, it is no surprise that "[w]hether a product is merchantable is often a question of fact." *Shea v. General Motors LLC*, 567 F.Supp.3d 1011, 1020 (N.D. Ind. 2021) (applying Indiana law). There are numerous examples of courts denying summary judgment on implied warranty of merchantability claims where there is a factual dispute as to the merchantability of the product. *See, e.g., Smith v. Nexus RVs, LLC*, 468 F.Supp.3d 1012, 1025 (N.D. Ind. 2020) (evidence that an RV's weight exceeded the front axle weight rating created triable issue of whether RV was merchantable); *Chesaco Motors, Inc. v. Gulf Stream Coach, Inc.*, No. 3:09–cv–383, 2013 WL 1281827, at *3 (N.D. Ind. Mar. 26, 2013) (declarations concerning warranty repairs and specific allegations of defects in complaint were sufficient to create factual dispute concerning merchantability).

Monroe cites *Sharp v. Tom Wood East, Inc.*, for the proposition that Indiana courts have found products to be merchantable as a matter of law if the plaintiff gets "substantial use out of the product even if the product contained some defects." [DE 181 at 14 (citing 822 N.E.2d 173, 175 (Ind. Ct. App. 2004)).] In *Sharp*, the plaintiff purchased a used car that she drove more than 22,000 miles over the span of 13 months, during which her car required some repairs. *Sharp*, 822 N.E.2d at 175. The court determined that these facts did not create any genuine issues of material fact as to whether the car fulfilled "its ordinary purpose of providing transportation" and affirmed summary judgment on the implied warranty claim. *Id.; see also Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587–88 (7th Cir. 2001) (applying the identical Illinois version of Section 2-314 and

affirming summary judgment for the defendant because the plaintiff continued to drive the allegedly defective vehicle for over 30,000 miles).

Monroe analogizes Polycon's use of Monroe's molds to produce tens of millions of plastic bottles over the course of seven years to the situation in *Sharp*. As the court in *Sharp* concluded that the ordinary purpose of a car is to provide transportation, Polycon admits that the ordinary purpose of Monroe's molds "was to make bottle." [DE 199 at 17.] In fact, Polycon's primary complaint concerning the molds is not that they were not able to produce bottles (their ordinary purpose), but that they did not fulfill their particular purpose of producing bottle "that met specific requirements communicated in drawings, dimensions and through samples." Polycon does not dispute that Monroe's molds for the 93-oz Ecolab capsule and 2.5-gallon Ecolab bottle were "qualified" by Ecolab and eventually (though not without hiccups and other alleged, lingering issues) produced commercially acceptable bottles for sale to Ecolab. [DE 200 at ¶¶23–24.] For the Ecolab molds, I find that the logic of *Sharp* and *Priebe* controls and that Polycon's use of the molds to produce millions of bottles that Polycon successfully sold demonstrate that the molds satisfied their ordinary purpose. Polycon's implied warranty of merchantability claim fails for the Ecolab molds.

However, Monroe's *Sharp* analogy tellingly does not differentiate the four sets of molds and instead lumps them all together. Had the four sets of molds each produced commercially acceptable results, I agree that the *Sharp* analogy would track. But whether the 2.5-gallon Top Handle and No Glug molds satisfied their ordinary purpose

29

is disputed. Polycon states that it "has never been able to qualify the No Glug molds for production" and that Monroe "has not provided No Glug molds that are usable, producing commercially acceptable bottles." [DE 213 at ¶¶118, 121.] The record is murkier on the outcome of the Top Handle molds. For example, Polycon notes that it was not willing to pay for the full price of the Top Handle molds in January 2018 because the molds had not produced "commercially acceptable containers at that point" but later suggests that reworks got the "Top Handle molds to work." [*Id.* at ¶¶109, 114, 117.] At this stage, as the non-moving party, Polycon is given the benefit of the doubt on this question concerning the viability of the Top Handle molds. Polycon has sufficiently highlighted a genuine issue of material fact as to whether Monroe's No Glug and Top Handle molds were merchantable to defeat summary judgment on its implied warranty of merchantability claim for these two molds.

I now turn to Polycon's breach of the implied warranty of fitness for a particular purpose claim. Indiana's implied warranty of fitness for a particular purpose provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under IC 26-1-2-316, an implied warranty that the goods shall be fit for such purpose.

Ind. Code § 26-1-2-315. Importantly:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

*Id*. at cmt. 2.

Polycon claims that Monroe's molds breached the implied warranty of fitness for a particular purpose because its molds were not capable of producing bottles that met the specifications of the drawings and sample bottles provided by Polycon. According to Polycon, the "proposals and purchase orders were completed with both parties knowing that the molds were to be capable of producing the bottles described." [DE 199 at 18.] In Polycon's view, the particular purpose of the molds was to produce exact duplicates of the specifications and sample bottles provided prior to the exchange of the proposals and purchase orders. Monroe instead defines the particular purpose as "to allow Polycon to make plastic bottles for Polycon's customer, Ecolab", and Monroe claims that its molds allowed Polycon to achieve this purpose. [DE 181 at 15.]

To begin, I must look to whether Monroe "at the time of contracting ha[d] reason to know any particular purpose" for which Polycon intended to use the bottles it produced with Monroe's molds. Ind. Code § 26-1-2-315. Of note, the "existence of an implied warranty is generally a question of fact to be determined by examining the circumstances under which the parties contracted." *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, 722 F.Supp.2d 1015, 1025 (N.D. Ind. 2010). There is no question that with respect to the 2.5-gallon Ecolab bottle and 93-oz Ecolab capsule molds that Monroe knew at the time of the Parties' agreement that Polycon intended to use those molds for the specific purpose of producing bottles that Polycon could sell to Ecolab. This is illustrated by the undisputed facts that Polycon sent Ecolab specifications for

these products to Monroe and that Monroe communicated with Ecolab itself to produce acceptable article drawings for these two sets of molds. [*See* DE 199-3; DE 199-6; DE 213 at ¶¶55–57.] As with the breach of contract claims for these two mold types, Polycon admits that it was able to use the molds Monroe provided to produce bottles and capsules that were qualified and purchased by Ecolab, though Polycon claims that other issues persisted for these two molds. [DE 200 at ¶¶23–24.] And again, this is the end of the line for Polycon's breach of implied warranty of fitness for a particular purpose claim with respect to these two molds. Monroe provided molds that satisfied the particular purpose of producing bottles that Polycon could sell to Ecolab as qualified bottles.

Summary judgment on this claim must also be granted as it relates to the two other molds—the 2.5-gallon Top Handle and No Glug molds—but for a different reason. Unlike the molds used to make the Ecolab bottles and capsules, there is simply no evidence that Monroe was aware of the particular purpose intended by Polycon. In other words, there is no evidence that Polycon intended to use the Top Handle and No Glug molds for a "specific use by the buyer which is peculiar to the nature of his business[.]" Ind. Code § 26-1-2-315, cmt. 2. Instead, on the record before me, all that Monroe knew is that Polycon was going to make bottles with the molds; that is nothing more than "the ordinary purposes for which" the molds are used which is "envisaged in the concept of merchantability." *Id*. In other words, Polycon's warranty claims relating to the Top Handle and No Glug molds are more suitable as implied warranty

of merchantability claims as opposed to claims of implied warranty of fitness for a particular purpose.

Before wrapping up this tedious and lengthy opinion, I will finally briefly address Monroe's arguments concerning the concepts of notice and opportunity to repair, which are applicable to both of Polycon's breach of implied warranty claims. To maintain an implied warranty claim, when tender has been accepted, the "buyer must, within a reasonable time after he discovers or should have discovered any breach, notify the seller of the breach or be barred from any remedy." Ind. Code § 26–1–2– 607(3)(a). "Alleging that notice was given is a condition precedent to a breach of warranty claim and the failure to give notice waives any right to assert a breach." *LDT Keller Farms, LLC*, 722 F.Supp.2d at 1025.

The Parties cite divergent case law on the requirements for this notice. Polycon cites case law from the 1980s and 1990s for the proposition that Indiana law "requires only that the buyer give notice of the factual circumstances that form the basis of the warranty claim." [DE 199 at 18.] Monroe argues that more recent case law has heightened the notice requirement to require that the plaintiff "prove that the manufacturer had at least three opportunities to repair an alleged defect." [DE 210 at 9.] I find that Monroe has the better of this argument, but ultimately this dispute is irrelevant.

The Seventh Circuit has been clear that in Indiana "just as with a claim for breach of an express warranty, a buyer must give the warrantor a reasonable opportunity to

cure any alleged defect in order to make a claim of breach of an implied warranty."

*Zylstra v. DRV, LLC*, 8 F.4th 597, 609 (7th Cir. 2021) (applying Indiana law); *Matthews v.*

*REV Recreation Grp., Inc.*, 931 F.3d 619, 622 (7th Cir. 2019) ("Under Indiana law, two

chances is not a reasonable opportunity to cure the defects such that the warranty failed

of its essential purpose."). But either way, this discussion is purely academic because

the Parties dispute the facts concerning notice of the alleged issues with the 2.5-gallon

Top Handle and No Glug molds. [*See* DE 200 at ¶¶17–19, 21.] I have reviewed the

factual record cited by Polycon in response to Monroe's Statement of Facts and agree

that Polycon has sufficiently raised a genuine issue of material fact as to the notice and

opportunity to repair question for the 2.5-gallon No Glug and Top Handle molds. [*See*

DE 199-13; DE 199-14; DE 199-18.] This factual dispute concerning notice is beside the

point, however, since I have already found that questions of fact exist as to the

merchantability of Monroe's 2.5-gallon Top Handle and 2.5-gallon No Glug molds and

found a sufficient factual basis to grant summary judgment with respect to all other

implied warranty claims.

### III.    Monroe's Breach of Contract Counterclaim

Polycon does not dispute that it has not paid Monroe the remaining 50% of the

original purchase price for the 2.5-gallon No Glug mold, which amounts to

approximately $116,500. [DE 213 at ¶100.] But because I have found that genuine issues

of material fact exist as to Polycon's claims for breach of contract and breach of implied

warranty of merchantability specific to the 2.5-gallon No Glug mold, I am unable to

reach the merits of Monroe's counterclaim concerning the payment for this mold. It will first be up to a jury to resolve the questions of fact specific to the 2.5-gallon No Glug mold. I therefore DENY Monroe's request for summary judgment on its breach of contract counterclaim.

## Conclusion

 **ACCORDINGLY**, the Court holds as follows:

As to Polycon's four breach of contract claims:

(1) Claim related to the *Delayed delivery of the molds*: I hereby **GRANT** summary judgment for Monroe on this claim with respect to all four molds.

(2) Claim related to *"Non-conforming molds"*: I hereby **GRANT** summary judgment with respect to the 2.5-gallon Ecolab and 93-oz Ecolab capsule molds but **DENY** with respect to the 2.5-gallon No Glug and 2.5-gallon Top Handle molds.

(3) Claim related to the *Failure to provide copies of engineering drawings*: I hereby **GRANT** summary judgment for Monroe on this claim with respect to all four molds; and

(4) Claim related to *Molds that "did not meet [s]pecifications"*: I hereby **GRANT** summary judgment with respect to the 2.5-gallon Ecolab and 93-oz Ecolab capsule molds but **DENY** with respect to the 2.5-gallon No Glug and 2.5-gallon Top Handle molds.

As to Polycon's claim for Breach of the Implied Warranty of Merchantability, I hereby **GRANT** summary judgment relating to the 2.5-gallon Ecolab and 93-oz Ecolab

capsule molds but **DENY** summary judgment as to the 2.5-gallon No Glug and 2.5-gallon Top Handle molds.

As to Polycon's claim for Breach of the Implied Warranty for a Particular Purpose, I hereby **GRANT** Monroe's motion as to all four molds.

SO ORDERED on September 26, 2024.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT