## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

POLYCON INDUSTRIES, INC.,     )
             )
     Plaintiff & Counter-Defendant,   )
             )
     v.           )     Case No. 2:19-CV-485-PPS
             )
R&B PLASTICS MACHINERY, LLC,   )
and MONROE MOLD, LLC,     )
             )
     Defendants & Counterclaimants.   )

## OPINION AND ORDER

In this now long running and contentious litigation, several motions to exclude testimony are presently before me. First, there is Plaintiff Polycon's motion to bar the expert testimony of two individuals associated with Defendant R&B Plastics [DE 221]. Second, there is R&B's renewed motion to exclude the expert testimony of Polycon's damages expert, Dr. Lynch [DE 244]. And third, R&B seeks to exclude both the testimony of Polycon's former Controller Jill Contro and a spreadsheet she prepared [DE 253]. For the reasons I discuss below, Polycon's motion to exclude **[DE 221]** is **GRANTED IN PART** and **DENIED IN PART**; R&B's motion to exclude concerning Lynch **[DE 244]** is **GRANTED IN PART** and **DENIED IN PART**; and R&B's motion to exclude Contro and her spreadsheet **[DE 253]** is **DENIED**.

## Legal Standard

The treatment of expert testimony changed dramatically when the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) made judges

1

instead of juries the principal gatekeeper of expert testimony. The case led to an important amendment to Federal Rule of Evidence 702. The Rule now authorizes testimony by a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" where (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." *Downing v. Abbott Labs.*, 48 F.4th 793, 808-09 (7th Cir. 2022) (quoting Fed. R. Evid. 702).

There's a three-step process in determining the admissibility of expert testimony under Rule 702: I must (1) review the proffered expert's qualifications; (2) then look at the reliability of the expert's methodology; and (3) determine its relevance. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

Step one evaluates, as Rule 702 instructs, the expert's "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. At step two, concerning reliability, courts may evaluate the following non-exhaustive list of factors: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Gopalratnam*, 877 F.3d at 779 (quotation and citation omitted). This *Daubert* standard "applies to all expert testimony, whether it relates to areas of traditional

scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000).

Finally, at step three courts evaluate whether "the expert testimony will assist the trier of fact." *Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019). This entails an evaluation of "whether the proposed scientific testimony fits the issue to which the expert is testifying." *Id.* One of my important roles as the gatekeeper is to be careful that the opinion isn't just some "ipse dixit" of the expert—telling me (or the jury) that something is true just because the expert says so when it is unmoored from the underlying data. *United States v. Owens*, 18 F.4th 928, 941 n. 5 (7th Cir. 2021).

When challenged, the party seeking to introduce the expert testimony has the burden to show, by a preponderance standard, that the testimony meets the *Daubert* standard. *Downing*, 48 F.4th at 809. Importantly, "[t]he rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F.Supp. 2d 1104, 1110 (N.D. Ill. 2005) (quotation omitted).

## I.    *Polycon's Motion to Exclude Expert Testimony [DE 221]*

Polycon seeks to exclude testimony from Fred Piercy, R&B's President and General Manager, and William Long, one of R&B's owners. In its initial motion, Polycon sought to exclude any testimony by Piercy and Long concerning "Polycon's profitability" and the profitability of Polycon's contract to produce plastic bottles for its

3

customer Ecolab. [DE 221 at 7.] But in reply, as will be discussed below, Polycon appears to expand the scope of its initial request to exclude.

R&B designated Piercy and Long as non-retained experts under Federal Rule of Civil Procedure 26(a)(2)(C). [DE 223-3 at 3–12, 24–26.] R&B disclosed the following opinion now at issue for Piercy:

> Mr. Piercy will testify about Polycon's contract with Ecolab based on his experience running blow-molding facilities similar to Polycon's while working at Amcor and his experience contracting for the sale of blow-molded containers. Based on the cost of resin, the cost of the equipment needed to produce containers for ECOLAB, Polycon's cost overruns on the ECOLAB project unrelated to any machine issues, Polycon's own history with less-than-stellar production efficiency, and the contract pricing, Polycon's contract with ECOLAB was doomed to failure from the start and would not have resulted in substantial profits for Polycon.

[*Id*. at 11.]

R&B disclosed the following opinion now at issue for Long:

> Mr. Long may also testify about Polycon's contract with Ecolab based on his experience running blow-molding facilities similar to Polycon's while working at AMCOR and his experience manufacturing and selling blow-molded containers. Based on the cost of resin, the cost of the equipment needed to produce containers for ECOLAB, Polycon's cost overruns on the ECOLAB project unrelated to any machine issues, Polycon's own history with less-than-stellar production efficiency, and the contract pricing, Polycon's contract with ECOLAB was doomed to failure from the start and would not have resulted in substantial profits for Polycon.

[*Id*. at 25–26.]

In its opening brief, Polycon argues that Piercy's and Long's opinions regarding the profitability of Polycon's contract with Ecolab are impermissible because they are premised on guesswork. According to Polycon, neither witness took any steps to "apprise themselves of the facts which could lead to a proper opinion", and they did

4

not employ any scientific or analytical method to form their opinions on profitability. [DE 221 at 6.]

In response, R&B relies heavily on Piercy's and Long's background and experience in the manufacture and sale of plastic bottles, which is the methodology used in forming their respective opinions. R&B also seeks to distinguish Piercy's testimony and concedes that it does not oppose Polycon's request to preclude Piercy from opining on the profitability of Polycon's Ecolab contract so long as Piercy is permitted to testify about a list of other topics. [DE 223 at 3–4.] Finally, R&B alleges that Polycon failed to disclose certain information that limited Piercy's and Long's ability to form their opinions.

In reply, Polycon does a head fake and changes its argument; it argues instead that Piercy and Long, as non-retained expert witnesses, cannot testify as to opinions formed after the commencement of litigation based upon information obtained during litigation. [DE 229 at 2.] Instead of seeking to bar Long's and Piercy's testimony concerning the *profitability* of the Ecolab contract, Polycon in reply now argues that "*all* of Mr. Long's and Mr. Piercy's opinions regarding the Ecolab contract . . . are improper and must be barred." [*Id*. (emphasis added).] Finally, Polycon argues that R&B seeks for Piercy to testify as to topics which were not included in his Rule 26(a)(2)(C) disclosure. [*Id*. at 9–11.]

Let's start with R&B's argument that Piercy and Long were unable to calculate expected or actual profit on the Ecolab contract because of Polycon's failure to disclose relevant information. This is a puzzling argument to raise at this hour given discovery

has long since closed. If Polycon indeed failed to provide R&B with information necessary for Piercy and Long to form their expert opinions, then R&B should have moved to compel the production of that information. R&B cannot sit on its hands in the face of alleged discovery violations and then point to the absence of that discoverable information to shore up perceived weaknesses with its experts' methodologies. Given R&B's failure to move to compel this information, I will set this argument to the side.

There is no question that Piercy and Long are qualified to opine as experts on plastic bottle manufacturing generally. Both have extensive backgrounds and experience in that sector. [*See* DE 223-1 at 3–17; DE 223-10.] Nor is there any question on the relevance of their opinions. Instead, Polycon challenges both the reliability of Piercy's and Long's opinions (step two of the *Daubert* inquiry) and whether Piercy and Long formed their opinions only after litigation (a Rule 26 issue). These are two related but separate inquiries that guide the permissible scope of Piercy's and Long's testimony. I'll begin with the reliability challenge. Given R&B's concession that it "does not oppose Polycon's motion to preclude Mr. Piercy from opining on the profitability of Polycon's contract with Ecolab", [DE 223 at 4], this first section primarily, though not entirely, concerns Long's testimony.

*Daubert* inquiries often focus on "scientific" expert testimony, but the *Daubert* inquiry applies to expert testimony based on "technical" or "other specialized knowledge" too. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999). Indeed, the Seventh Circuit has instructed that "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v.*

6

*Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *Smith*, 215 F.3d at 718 (same). Experience, however, is not a blank check for expert testimony. An expert testifying based on their experience still must explain the methodologies and principles that support their opinion; they "cannot simply assert a bottom line." *Metavante Corp.*, 619 F.3d 761 (citation omitted). Thus, to the extent that Polycon argues Long failed to "utilize any scientific or analytical method", that argument is overbroad because both experts may draw upon their experiences and specialized knowledge to form their opinions.

*Metavante Corp.* provides an instructive example of an expert who properly testified based on their industry experience rather than based on some scientific theory or principle. In that case, the Seventh Circuit affirmed the decision to permit a consultant designated as an expert in the "performance of financial technology agreements" to testify as to the commercial reasonableness of the plaintiff's performance under a specific services agreement. 619 F.3d at 760. The Seventh Circuit rejected the notion that the consultant's testimony was conclusory *ipse dixit*. Rather, the consultant was found to have properly used his experience in finance to apply criteria that firms use to evaluate technological innovations. *Id.* at 761–62.

As detailed in Long's Rule 26(a)(2)(C) disclosure, Long bases his opinion on his experience running blow-molding facilities (which includes experience with manufacturing and sales), the cost of resin, the cost of equipment needed to produce Ecolab containers, Polycon's cost overruns, Polycon's manufacturing history, and the contract pricing. [DE 223-3 at 25–26.] This disclosure mirrors the bases Long identified

during his deposition: Polycon's record of operation and maintenance, substantial capital investment and startup costs to implement new blow molding machines, the timeline described in the Ecolab contract, Polycon's staffing levels and technical expertise, and the gross margins for the products Polycon contracted to produce for Ecolab. [DE 223-1 at 21–23.] Long said he analyzed these factors "relying on my past experiences on major capital investments of similar amounts, as well as much, much higher" and concluded that Polycon's contract "was not going to be a success and was doomed to failure." [*Id*. at 23.]

To determine whether Polycon made a profit on its Ecolab business, Long said "I did not make any specific calculations." [*Id*. at 24.] Polycon then asked Long about his opinions on profitability for specific years. Concerning the profitability of Polycon's Ecolab business in 2017, Long said "I don't have financials to give me specific insight, but my guestimate, relying on my experience in the business, based on all the things I'm aware of in terms of issues in the plant, up and down time, start, stops, et cetera, et cetera, the . . . pricing that was in place, I doubt if in 2017 there was any profit generated on – on that business." [DE 221-3 at 2–3.] After 2017, Long testified that he had "less and less" insight and knowledge about Polycon's operations. [*Id*. at 3.] Accordingly, for profitability estimates for 2018 through 2020, Long said the 2.5-gallon Ecolab product "may have been profitable" but doubted that the 93 oz capsule product was profitable, though he acknowledged that his profitability estimates for all three years were a "guess." [*Id*. at 3–4.]

8

Long acknowledged that he did not have information on the volume of Polycon's sales to Ecolab over later years after amendments to the original 2016 supply agreement. [*Id*. at 4–5.] Long conceded that he did not know the cost of resin over the course of Polycon's contract with Ecolab, though he said he was able to calculate it based on documents produced to R&B. [DE 223-1 at 25–26.] And though Long said he reviewed the original Ecolab supply agreement and the first amendment to that agreement, he had not seen the second and third amendments. [*Id*. at 27; DE 221-3 at 2.]

Central to the Parties' dispute is the scope of Long's testimony. I agree with Polycon that if R&B designated Long to testify as to actual or expected profit calculations on the Ecolab contract for 2017 through 2020, that would be impermissible. Long, and R&B, admitted that he lacked the information necessary to perform specific calculations, so instead he "guesstimated." That is not a sufficiently reliable methodology to perform profitability calculations. *Cf. Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (permitting a CPA to calculate the discounted present value of lost future earnings based on financial information and assumptions provided by counsel).

R&B, however, argues that Long "was never asked to provide a calculation of Polycon's actual or expected lost profits" and instead seeks to testify as to "opinions he formed in the course of the business relationship between Polycon and R&B based on what he learned about Polycon's manufacturing operations during that time." [DE 223 at 3, 10.] The question is whether Long may testify, based on his experience, as to this more general topic. *Metavante Corp.* counsels that such testimony would be permissible.

9

I understand Long to be leveraging his experience in the plastic bottle industry and his experience and knowledge specific to his relationship with Polycon to opine in general terms on the profitability of Polycon's Ecolab contract. To the extent Long seeks to testify as to specific profitability calculations or data, he is prohibited because he did not perform any such calculations.

This does not end the inquiry for Long, however. Turning to Polycon's next argument, I must place additional limitations on the scope of Long's testimony given that much of the bases for his opinion were not known or available to Long until after the commencement of litigation.

As non-retained hybrid fact/expert witnesses, Long and Piercy "must testify from the personal knowledge they gained on the job." *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 371 (7th Cir. 2017); *LeBlanc v. Mr. Bult's, Inc.*, No. 15 C 6019, 2019 WL 3776957, at *4 (N.D. Ill. Aug. 12, 2019) ("Forming an opinion based on a review of documents . . . after the fact is the province of a retained expert witness under Rule 26(a)(2)(B)" and not a non-retained expert) (citation omitted). Polycon argues that both Piercy and Long did not know the details of Polycon's contract with Ecolab necessary to form their opinions prior to commencement of the present litigation. As a result, Polycon moves to bar "all of Mr. Long's and Mr. Piercy's opinions regarding the Ecolab contract." [DE 229 at 2.]

Long testified during his deposition that he was not personally involved in R&B's decision to sell the 4/11 and 8/16 machine to Polycon. [DE 229-3 at 2–6.] However, Long went on to testify that he and Piercy were involved, starting in early

2017, in troubleshooting Polycon's problems operating the R&B machines and in getting products qualified for sale to Ecolab. [*Id*. at 6.; DE 223-2 at ¶8.] This means Long is prevented from opining that Polycon's April 2016 contract with Ecolab was "doomed to failure from the start", [DE 223-3 at 26], because it appears that Long had no personal involvement or knowledge of the details of that contract prior to litigation. *See LeBlanc*, 2019 WL 3776957, at *4.

But Long was clearly involved in Polycon's attempts to qualify and produce Ecolab products after 2017 and before the present litigation began in 2019. If during that time Long received information that would allow him to generally opine on the likelihood that the Ecolab contract would be a profitable one, he will be permitted to testify on that subject. But a proper foundation will have to be laid first. I cannot now determine the admissibility of his testimony beyond that. It is enough to say that he will be limited to the scope of facts he learned and opinions he formed during his interactions with Polycon prior to litigation and which are fairly raised in his Rule 26 disclosure.

Similarly, by the time of his deposition, Piercy had never seen nor read Polycon's contract with Ecolab and did not know the price, profit margin, or volume of sales for the two products Polycon sold to Ecolab. [DE 221-2 at 2–5.] Like Long, Piercy, as a non-retained, hybrid fact/expert witnesses, "must testify from the personal knowledge [he] gained on the job." *Indianapolis Airport Auth.*, 849 F.3d at 371; *LeBlanc*, 2019 WL 3776957, at *4. In response to Polycon's motion, R&B now states it "does not expect to elicit any testimony from Mr. Piercy regarding his opinions on whether Polycon's contract with

Ecolab would have been profitable." [DE 223 at 3.] I accept that concession and the point is therefore moot: Piercy will be prohibited from testifying about the profitability of Polycon's specific Ecolab contract.

Nevertheless, R&B continues to seek to elicit four categories of information from Piercy: (1) how the cost of resin factors into profitability of a plastic bottle manufacturer; (2) the timeframe for a manufacturer to get a new line up and running and bottles qualified; (3) the competitiveness of the plastic bottle market and how Polycon would likely have to price its products to win the business of a customer like Ecolab; and (4) how a large capital project like Polycon's business with Ecolab would affect the profitability of the overall project. [*Id.* at 3–4.]

These categories of information are generalized enough that, based on Piercy's background and experience in the plastic bottle manufacturing industry, he is likely qualified to discuss them. And while Rule 37 prohibits a party who fails to provide information as required by Rule 26(a) to use that witness at trial, at this stage the discussion is too abstract to make a clear ruling. Certain of the four topics of information R&B in its response seeks to permit Piercy to testify about appear within the scope of his Rule 26(a)(2)(C) disclosure. At this stage, I find it to be a more practical outcome to defer a broad ruling and instead permit Polycon to raise specific objections to the scope of Piercy's testimony during trial. As with Long, Piercy's testimony will be guided by the limits of his Rule 26(a)(2)(C) disclosure and his knowledge prior to the commencement of litigation (given his designation as a non-retained expert). I will confront challenges to the scope of his testimony as they arise during trial.

12

To sum up: to the extent that Piercy and Long have knowledge of Polycon's contract with Ecolab based on their personal knowledge from R&B's interactions with Polycon, they are of course permitted to testify as to that knowledge as fact witnesses. Long and Piercy may also draw upon their experience and expertise in plastic manufacturing to opine on the factors that would likely make the Ecolab deal successful or not. But as discussed above, their testimony will be limited to what was in their Rule 26 disclosures or matters reasonably to be inferred from it.

## II.    *R&B's Motion to Exclude Polycon's Damages Expert [DE 244]*

In its motions to exclude, R&B launches a two-pronged attack on Polycon's efforts to prove its alleged damages. First, R&B moves to exclude the testimony of Polycon's damages expert Dr. Gerald Lynch. Second, R&B moves to exclude a spreadsheet relied upon by Dr. Lynch to form his opinions and testimony from the drafter of that spreadsheet, Jill Contro (Polycon's former Controller). The motions rely upon much of the same facts and background.

R&B seeks to exclude the testimony of Dr. Lynch. [DE 168, 244.][1] I held a hearing on the motion on December 11, 2024. [DE 256.] In ruling on the current motion, I considered R&B's prior iteration of its motion [DE 168] as well as relevant portions of that hearing.

R&B alleges that Dr. Lynch's testimony fails to meet the reliability standards of Federal Rule of Evidence 702 and *Daubert* because Lynch used his credentials to

---

[1] R&B originally moved to exclude Dr. Lynch's testimony in November 2023 [DE 168], but I denied this motion without prejudice to be refiled at the appropriate time. [DE 236 at 17–18.]

13

"launder[ ] the inadmissible speculation" of Polycon. [DE 170 at 2.] R&B challenges

Lynch's process and the data he relied upon. First, R&B says that Lynch relied upon

data "spoon-fed to him" by Contro and "did *nothing* to independently vet or verify"

that information. [DE 168 at 1 (emphasis in original).] This information included (1)

profit margins; (2) projected sales volume; and (3) efficiency rates for Polycon's

manufacturing processes. Much of the information Lynch relied upon came from a

spreadsheet prepared by Contro (more on that in the next section). According to R&B,

Lynch did not review the source data for the spreadsheet and, instead, simply accepted

Contro's calculations. [DE 170 at 6.] Relatedly, R&B takes issue with Lynch's reliance on

Berle Blitstein's (Polycon's President) assertions concerning the market for the 2.5-

gallon stock container product. [*Id*. at 7–8.] Finally, R&B argues that the data Contro

provided to Lynch was either false or not supported by the evidence. [*Id*. at 10–18.]

Polycon responds that experts, such as Lynch, can offer opinions based upon

financial information provided to them by a party and even by a party's counsel. [DE

205 at 2.] Moreover, Polycon argues that R&B's arguments regarding the validity of the

data Lynch used goes to the weight of the evidence (a jury issue) and not the

admissibility of his opinion. [*Id*.] Polycon also defends the validity of the data prepared

by Contro, and in turn used by Lynch, concerning profit margins, projected sales

volumes, and manufacturing line efficiency. [*Id*. at 7–9.]

During the December 11, 2024, hearing on this motion, R&B focused on three

alleged problems with Lynch's report that R&B argues illustrate its challenge to Lynch's

methodology and data: (1) Lynch copied Contro's calculation of increased costs of

production that used an inaccurate estimate of the number of bottles actually sold; (2) Lynch's opinion that Polycon lost $4.7 million in profits because Ecolab did not renew its contract with Polycon; and (3) Lynch's opinion concerning an alternative market for the 2.5 gallon stock container product. [DE 258 at 10–18.] I will summarize below the discussion on these examples R&B selected.

Lynch calculated that Polycon suffered approximately $3.6 million in lost profits due to higher costs of production. [DE 205-2 at 7–8.] This figure is the sum of higher costs to produce the 93 oz capsule and 2.5-gallon Ecolab products. Concerning the 93 oz capsule, the higher costs of production include two manufacturing lines: "Line 2" (which used the new R&B machines) and "Line 11" (which used Polycon's existing older and slower machines). According to Polycon, the newer machines on Line 2 produced bottles at a slower rate than contracted for, so Polycon also had to produce bottles on its older Line 11 machines to meet required demand. Lynch testified that the slower rate of production also resulted in higher costs of production because of additional overhead. [DE 258 at 99–104.]

To formulate this opinion, Lynch testified that he used figures supplied by Contro for the expected and actual costs to produce one thousand units of each product. [*Id*. at 98–99.] Lynch said Contro calculated the cost per thousand by using historical cost records and projections for labor, machine output rate, and materials ("Actual Achieved" on Table 1 of Lynch's report) compared to R&B's advertised, and (according to Polycon) expected, output per minute rates ("Per Spec" on Table 1 of Lynch's report). [*Id*. at 99–101; DE 205-2 at 7.] For the annual production volume figures, Lynch used

15

15.8 million for how many capsules the Line 2 machines should have produced (which he said was a halfway point between the minimum and maximum output figures in the Ecolab contract) and 11.8 million for how many capsules the machines actually produced. [DE 258 at 100–02; DE 205-2 at 7.]

On cross examination, R&B pointed out that Lynch copied and pasted Tables 1, 2, and 3 in his report from a spreadsheet provided by Contro that she had prepared in 2018. [DE 258 at 122.] Lynch noted, however, that the information in Contro's spreadsheet was "exactly . . . the kind of information [he] would need" to prepare his report and would have asked for anyway. [*Id.* at 123.] Lynch did not look at source documents to verify Contro's work. [*Id.* at 123–24.] Lynch trusted the numbers Contro provided and said exploring the source data was "not a standard approach that I think I or any other economist would take." [*Id.* at 124.] Importantly, Lynch did not know that the 11.8 million production figure listed for "Actual Achieved" of the 93 oz capsules in Contro's spreadsheet, and incorporated into Table 1 of his report, was a calculation by Contro and not the true production number. [*Id.* at 130.]

R&B also highlighted that Lynch assumed that Polycon would have been able to renew its contract with Ecolab for another three years past the initial 2016 – 2019 term. [*Id.* at 148–49.] Lynch confirmed that he used 14.5 million in per year sales for the 93 oz capsules to estimate the lost profits that stemmed from the loss of an additional three-year renewal by Ecolab. [*Id.* at 152.] Lynch acknowledged that this figure did not include the impact of the COVID-19 pandemic, which decreased profit margins in the plastic bottle industry. [*Id.* at 150.] Lynch also conceded that he did not know the actual

16

volume of Polycon's sales to Ecolab during the three-year extension period he estimated. [*Id*. at 153–54.]

Concerning Lynch's opinion for lost revenue and profit on the 2.5-gallon stock container, Lynch testified that Blitstein told him Polycon could sell 9 million bottles per year for three years (for a total of 27 million bottles) based on his "knowledge of the market." [*Id*. at 96.] Lynch incorporated this figure ("Remaining Capacity") into Table 3 of his report. [DE 205-2 at 11.] Lynch acknowledged the lack of concrete data to support Blitstein's statement, so he cut the total 27 million bottle estimate over three years by two thirds down to a total of 9 million over three years. [DE 258 at 96.] Lynch acknowledged that cutting the number by two thirds was not based on economic or market analysis or any calculations. [*Id*. at 136.] Lynch noted: "I don't have a cost per bottle for other producers, but it was based on the information that they felt they had that they said they thought they could sell that amount." [*Id*. at 98.] Lynch then used the sale price and profit margin provided by Contro to calculate the lost profits for that product. [*Id*. at 96–97.]

During the hearing, given its centrality to this dispute, I explicitly asked Lynch to explain his methodology and his use of the figures Contro provided. [*Id*. at 160.] Lynch acknowledged that much of the data he would typically have asked for to prepare his report, such as profit margin and expected sales figures, had already been pulled together by Contro. [*Id*. at 160–61.] Lynch said he then analyzed the figures already prepared by Contro and translated them to prose format in his report. [*Id*. at 161–62.]

He described this as a standard approach economists use. [*Id.*] Indeed, Lynch agreed with the characterization of his work as a confirmation of Contro's work. [*Id.* at 162.]

This motion requires an examination of the nuances of challenging an expert's methodology versus the accuracy of their data. This is a difficult line to walk. "If the proposed expert meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with familiar tools of vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal citation omitted). And "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility." *Loeffel Steel Prod., Inc.*, 372 F. Supp. 2d at 1119. In fact, "[a]n expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him." *Matter of James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992). That said, while an expert may to some extent rely upon information furnished by a party, they still must employ some methodology to analyze that data, otherwise their testimony is nothing more than improper *ipse dixit. Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

R&B categorizes this situation as "one of the rare instances where cross-examination will not suffice" and exclusion is warranted. [DE 208 at 3.] According to R&B, because Lynch's methodology "was simply repeating information supplied to him by others, the Court must specifically inquire into the reliability of the foundation" for his opinions and whether they are supported by "independent bases." [*Id.* at 4.]

18

R&B's counsel during the December 11, 2024, hearing acknowledged the general premise that Lynch is allowed to accept the assumptions provided by Polycon but sought to distinguish this established rule by arguing that the assumptions Lynch relied upon were "speculative or wildly-unsupported hypothetical guesses." [DE 258 at 9.]

In its initial briefing, R&B took issue with the mere fact of Lynch's admitted reliance on data provided to him by Polycon. But the law is clear that an expert's use of data provided by a party, and even by a party's counsel, is permissible and not on its own enough indicia of an unreliable methodology. For example, in *Tuf Racing Products, Inc.* the Seventh Circuit approved of an accountant's use of "financial information furnished by [the plaintiff] and assumptions given him by counsel on the effect of the termination on [plaintiff's] sales" to calculate the discounted present value of lost future earnings. 223 F.3d at 591.

R&B later shifts the focus of its argument to assert that "the issue here is less that Lynch relied on information from employees", but rather that Lynch did nothing to independently verify that information. [DE 208 at 8.] To support this claim, R&B argues that the data Lynch relied on is false or unsupported by the evidence. So, to what extent must an expert verify the accuracy of the information provided to them in forming their opinions? This is a messy area of law. It is indeed difficult to square comments from the Seventh Circuit that "[a] *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy", *Lapsley*, 689 F.3d 802 at 805, with district court cases cited by R&B that require experts to "independently verify the reliability" of data used to form their opinions. *See State Farm*

19

*Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F.Supp.2d 1031, 1049 (N.D. Ind. 2013);

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp.2d 870, 887–93 (E.D. Wis. 2010).

Before diving deeper into this question, I first address the argument R&B raised during the December 11, 2024, hearing that a December 2023 Amendment to Rule 702 dramatically changed the landscape of a court's responsibilities in a *Daubert* inquiry. [DE 258 at 168–71.] According to R&B, courts now must ensure that experts verified the accuracy of the data underlying their opinions before admitting that testimony. [*Id.* at 168–69.] R&B described the 2023 Amendment as abrogating substantial case law in this Circuit and agreed with the suggestion that the 2023 Amendment to Rule 702 is a sea change to the *Daubert* inquiry.

The December 2023 Amendment added language to Rule 702 to clarify that the proponent of expert testimony must satisfy Rule 104(a)'s requirement to demonstrate that it is more likely than not that the proffered testimony meets the admissibility requirements. The Advisory Committee explained that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility", which is "incorrect." Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments. The Committee reiterated "that arguments about the sufficiency of an expert's basis [do not] always go to weight and not admissibility." *Id.*

R&B points to *West v. Home Depot U.S.A., Inc.* as evidence of the supposed sea change in the law. No. 21 CV 1145, 2024 WL 2845988 (N.D. Ill. June 5, 2024). In that case, the court opined on the 2023 Amendment to Rule 702 when considering a motion to

reconsider its prior ruling excluding expert testimony from three doctors. *Id*. at *2. The court interpreted the Amendment as instructing courts to evaluate whether it was more likely than not the expert's opinions were based on sufficient facts or data. *Id*. at *3 ("A proper methodology is not enough if the expert did not rely on sufficient facts or data."). The court concluded that the plaintiff had not met her burden with respect to the three doctors in question because they relied, in part, on inaccurate and "affirmatively misleading" medical histories. *Id*.

I see *West* as a unique situation that does not squarely fit R&B's critiques of Lynch's data. Of course, I agree with *West* that the Rule 104(a) preponderance standard applies to evaluation of an expert's facts and data. That is a plain statement of the amended text of Rule 702. But in *West* the experts relied upon "affirmatively misleading" information provided by the plaintiff in their medical history. It's a stretch to say that is the same situation here. As I understand it, R&B disputes Lynch's reliance on Contro's calculations because R&B views the underpinnings of that data as shaky. But there is nothing to suggest that Contro's data was affirmatively misleading.

Having conducted additional research, I am not convinced, as R&B suggests, that the 2023 Amendment is a sea change to the Rule 702 analysis of the sufficiency of an expert's facts or data. At best, the case law in this Circuit post December 2023 suggests a ripple on the surface. *See Dennis v. Andersons, Inc.*, No. 20-cv-4090, 2024 WL 4433471 (N.D. Ill. Oct. 7, 2024). Indeed, the Advisory Committee itself noted:

> Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702. Similarly, nothing in the

amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection. On the other hand, it does not permit the expert to make claims that are unsupported by the expert's basis and methodology.

Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments. As the Committee Notes make clear, the Amendment clarifies that the Rule 104(a) preponderance standard applies to Rule 702 and that courts cannot put their head in the sand when it comes to evaluating the sufficiency of an expert's bases for their opinions. As an aside, R&B's reliance on case law that predates the 2023 Amendment further supports the understanding that courts in this Circuit are still operating under largely the same framework as before the Amendment.

Having established that there has been no sea change to the Rule 702 / *Daubert* inquiry since December 2023, I return to the question of a court's duty to examine the sufficiency of an expert's facts or data. As I see it, there are two separate inquires here. First, whether Lynch failed to independently verify the figures he received from Contro in her spreadsheet. And second, whether Lynch failed to verify the sufficiency of Blitstein's comments concerning the market for 2.5-gallon stock bottles (a product that Polycon did not manufacture and sell specifically for Ecolab). I begin with the first question of whether, and to what extent, Lynch had a duty to verify the data Contro provided.

In *State Farm*, the court adopted the findings of a magistrate judge who struck certain opinions of an expert as based on an unreliable methodology. 980 F.Supp.2d at 1041. The expert witness's analysis compared two different data sources for dryer fires.

She compared the total number of dryer fires (for all manufacturers nationwide) reported in a national report with the self-reported number of fires involving the defendant manufacturer's dryer based on information reported to the manufacturer. *Id*. at 1048–49. The expert admitted she did not review any other documents or examine the nature of the sources that reported the fires to the manufacturer. *Id*. at 1049. In fact, the expert seems to have primarily, or even entirely, relied upon internal and outside counsel for her information and not any of the defendant's employees (who were not lawyers). *Id*. at 1049 n.6. The court determined that this failure to "independently verify the reliability" of the manufacturer data rendered her statistical analysis unreliable. *Id*. at 1049. The court determined that the selection of two different types of data also meant that her statistical analysis was flawed. *Id*.

In *Fail-Safe*, the court found the opinions of two expert witnesses unreliable. One of those experts relied on a single, undated PowerPoint slide that stated the company's hopeful market demand and its assumptions on how quickly the product would grow on the market. 744 F. Supp. 2d at 887–88. The court concluded that the expert had conducted no independent analysis of the data or the market for the product and was "merely parroting" hopeful projections by company executives. *Id*. at 888–89. Additionally, the court criticized the expert for "in no way scrutiniz[ing] [defendant's] assumptions." *Id*. at 888.

Polycon seeks to distinguish *Fail-Safe* and similar cases because the "analytical method was suspect." [DE 205 at 10.] That is true, but these cases were also explicit about their focus on the experts' failure to scrutinize assumptions and suspect data

provided to them by parties. However, there are some important differences in Lynch's use of Contro's data and the data relied upon by experts in *Fail-Safe* and in *State Farm*. For starters, the figures Contro provided Lynch were not merely untethered, hopeful projections by Polycon executives (as in *Fail-Safe*) nor did Lynch parrot client and attorney fed data without any understanding of the basis for that information (as in *State Farm*). The data Contro supplied was grounded in the Ecolab supply contract, specifications provided by R&B concerning their machines, and historical sales performance and profit margins. That Contro had already compiled the information Lynch said he would pull together in the normal course of conducting his economic analysis does not somehow make the underlying data unreliable. And while Lynch did not himself appear to review much of the source data for Contro's calculations, unlike in *State Farm* he discussed the source of this information directly with Contro and confirmed that she would verify its accuracy. [DE 258 at 122–25.]

R&B indeed raises interesting questions concerning some of Contro's and Lynch's calculations and assumptions that formed the basis of Lynch's report. But that is what vigorous cross-examination is all about. At this point, I cannot say that the data is outright incorrect, intentionally misleading, or baseless. I therefore conclude that Polycon has satisfied its burden to prove that Lynch's testimony, as it relates to the information provided by Contro, is more likely than not based on sufficient facts or data. I find the data in *Fail-Safe* and *State Farm* to be more speculative and baseless than the data Contro provided to Lynch. To the extent that these cases and others took a more exacting approach to review of an expert's data, I decline to do so given the

24

preponderance standard, the Advisory Committee Notes to the 2023 Amendment to Rule 702, and the clear Seventh Circuit instruction that evaluation of whether an expert used the "best" data as well as their conclusions are matters for the jury. *Manpower, Inc.*, 732 F.3d at 808 ("[A]rguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury.").

Lynch's reliance on Blitstein's statements is a different story. Lynch relied on Blitstein's comments alone concerning the existence and scope of the market for the 2.5-gallon stock container products. Lynch testified that he did not see any documents that analyzed the existence of such a market, did not know of any specific customers, and had not seen any marketing material Polycon would have used for such a market. [DE 258 at 135–38.] Unlike Contro's data for the Ecolab products, Blitstein's loose comments on the 2.5-gallon stock container market were not guided by any specific supply agreement or historical sales data. Moreover, Lynch conceded that he never conducted any independent analysis of the 2.5-gallon stock bottle market to verify the information Blitstein provided. [*Id.* at 136–38.] And I agree with R&B that the two out of circuit cases cited by Polycon are not persuasive because Blitstein provided no historical sales information for the 2.5-gallon stock bottles. [DE 208 at 6.] In sum, I largely deny R&B's motion but will grant it in part for the limited purpose of excluding Lynch's testimony concerning lost profits for the 2.5-gallon stock container product.

**III.**    ***R&B's Motion to Exclude Expert Testimony and Spreadsheet Prepared by Polycon's Former Controller [DE 253]***

Finally, as the second prong of its challenge to Polycon's ability to present evidence of damages, R&B challenges the admissibility of former Polycon Controller Jill Contro's testimony and a spreadsheet she prepared concerning production costs and damage estimates. This is the same spreadsheet discussed above in R&B's challenge to Lynch's opinions.

R&B seeks to exclude Contro's spreadsheet as inadmissible hearsay. According to R&B, the spreadsheet is an out of court statement offered for the truth of the damages' calculations contained therein. [DE 253 at 8.] And because R&B alleges that Contro's spreadsheet "was specifically made for Polycon to use in this case; it was not prepared in the ordinary course of Polycon's business", R&B asserts that the business record hearsay exception does not apply. [*Id.* at 2–3, 8–9.] R&B also argues that Polycon did not disclose Contro as an expert witness, so she should be barred from offering any expert opinions at trial. [*Id.* at 9–10.]

As to the last point, Polycon tells me that Contro is a fact witness, not an expert witness. Polycon says Contro will testify about her personal knowledge of the events at issue in this case and the details of the calculations she supplied to Lynch. [DE 255 at 6.] In short, Contro will not be providing any opinion testimony and so nothing more need be said about it. Instead, the real issue is whether Contro's spreadsheet is admissible as a business record under FRE 803(6). I find that it is. Polycon also argues that Contro's spreadsheet is admissible as a summary under FRE 1006. But because I find that the document is admissible under FRE 803(6), I need not address this argument.

No one disputes that Contro's spreadsheet is hearsay: it is indeed an out of court statement offered to prove the truth of the matter asserted (the data and calculations contained therein). But Rule 803(6) is an exception to the rule prohibiting hearsay commonly referred to as the "business records" exception. The Rule states as follows:

(6) **Records of a Regularly Conducted Activity**. A record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

The Parties primarily disagree as to whether Contro prepared this spreadsheet in anticipation of litigation. This dispute asks me to evaluate whether subparts (A), (B), and (C) of Rule 803(6) are satisfied. R&B argues that Contro created the spreadsheet in "June 2018 to provide damages allegations for her boss, David Blitstein, who then cited those figures in a letter threatening R&B with litigation." [DE 259 at 2.] Polycon responds that Contro created the spreadsheet during the course of her duties as controller as an "analytical tool to assess profitability of the bottles produced on [Polycon's machines]." [DE 273 at 3.]

During the December 11 hearing, I directly questioned Contro as to the timeline of creation, purpose, and usage of the spreadsheet. Contro prepared the spreadsheet in

27

June 2018. [DE 258 at 52.] This was during the three-year supply contract with Ecolab and prior to the present litigation. Contro credibly testified that she created this spreadsheet "through the ordinary course of business and financials to know how much the bottle would cost to produce versus what the selling price was and how much we were actually attaining." [*Id*. at 35.] Contro acknowledged that she would not have done this analysis if the machines were "running perfect[ly]", but she collected this information as part of her duty as controller to understand the impact of Polycon's financial results. [*Id*. at 45.] Contro said she conducted this analysis at "multiple points", including before and during operation of the machines Polycon purchased from R&B. [*Id*. at 35] And Contro testified that she prepared this information in part so that Polycon (through Blitstein) could approach Ecolab to negotiate a price increase under the supply agreement. [*Id*. at 45.]

I find that Contro created her spreadsheet during the course of a regularly conducted business activity. Contro's testimony was clear as to the timing and purpose for which she created this document. This was not a "made for litigation" spreadsheet as R&B asserts. Contro credibly testified that she prepared the spreadsheet for two business purposes: (1) assessing Polycon's financial situation by examining the profitability of its R&B-created machine production lines and (2) negotiating a price increase with Ecolab. *Cf. King v. Ind. Harbor Belt R.R.*, Case No. 2:15-CV-245 JD, 2018 WL 5982134, at *3 (N.D. Ind. Nov. 13, 2018) (rejecting admissibility as a business record where plaintiff presented no argument that his occupation required him to make the recording at issue and his counsel admitted that the recording was created for

litigation). That Blitstein later cited the figures contained in Contro's spreadsheet in a July 26, 2018, letter to R&B that alleged a breach of contract and warranty does not change the spreadsheet's initial purpose. [*See* DE 255-8 at 4–6]

Nor is there any problem that Contro relied upon information reported to her by others that she incorporated into her report. "The business records exception to the hearsay rule clearly does not require that the witness have personal knowledge of the entries in the records. The witness need only have knowledge of the procedures under which the records were created." *U.S. v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984). Contro relied upon scrap analysis that was regularly included in production reports, costs due to delayed start up time that were tracked by Polycon's CFO, and machine downtime hours that were regularly kept business records. [*See* DE 273-2 at 4–5; DE 273-3 at 7–8.] Contro, as the custodian of the spreadsheet, has adequately demonstrated at the December 11 hearing and in her December 9, 2022, declaration that the criteria for Rule 803(6) have been satisfied. [DE 137-10 at 2–5.]

Accordingly, R&B's motion to exclude Contro's spreadsheet is denied. R&B's separate request to exclude Contro from offering expert testimony at trial is also denied given that Contro has been designated as a fact witness only and R&B has not identified any opinions that it argues exceed the scope of a fact witness.

## Conclusion

For the aforementioned reasons, Polycon's motion to exclude [**DE 221**] is **GRANTED IN PART** and **DENIED IN PART**; R&B's motion to exclude concerning

Lynch [**DE 244**] is **GRANTED IN PART** and **DENIED IN PART**; and R&B's motion to exclude Contro and her spreadsheet [**DE 253**] is **DENIED**.

      **SO ORDERED**.

      ENTERED: March 26, 2025.

                             /s/ Philip P. Simon
                             UNITED STATES DISTRICT JUDGE